[No. C049525. Third Dist. June 28, 2006.]

SAVE OUR NEIGHBORHOOD et al., Plaintiffs and Appellants, v. KATHI LISHMAN, as Mayor, etc., et al., Defendants and Respondents; EDWARD MACKAY, Real Party in Interest and Respondent.

## COUNSEL

Stephan C. Volker, Joshua A. H. Harris and Marnie E. Riddle for Plaintiffs and Appellants.

Remy, Thomas, Moose and Manley, Whitman F. Manley, Sabrina V. Teller, and Angela M. Whatley for Defendants and Respondents and for Real Party in Interest and Respondent.

## OPINION

**HULL, J.**—After the City of Placerville (the City) approved a project for the construction of a hotel, gas station, and convenience store complex, various residents near the project site brought this action for writ of mandate claiming, among other things, the approval violated the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.; further undesignated section references are to the Public Resources Code) and the project is inconsistent with the City's general plan. The trial court entered judgment denying the petition, concluding the City proceeded in the manner required by CEQA and there is substantial evidence to support the City's approval. Plaintiffs appeal nearly every aspect of the trial court's decision. We agree with plaintiffs that the City did not comply with CEQA and reverse the judgment.

## FACTS AND PROCEDURAL HISTORY

This dispute involves a development project planned for an 8.2-acre parcel of real property located in the eastern portion of Placerville between Smith Flat Road to the north and State Highway 50 to the south (the property). The area north of the property includes Smith Flat, a low density residential community.

In 1986, the City approved construction of a restaurant and 100-unit motel on a portion of the property. In 1988, the City approved a project with a "104-unit motel, restaurant, coffee shop, banquet facilities, lounge, retail area, gas station and mini-mart" for the property. This latter project was resubmitted for approval in 1995, but this time was rejected by the City.

Prior to 1990, the property was in an area zoned "Tourist Residential." In 1990, this designation was changed to "Highway Commercial," permitting "freeway-oriented uses such as fast-food restaurants, gas stations and other uses . . . necessary and convenient to the traveling public."

In 1997, Bob Bartels, of Point View Development and Management Corporation, submitted a proposal to construct a 106-unit motel, restaurants, lounge, gas station, convenience store, and car wash on the property. This project, the North Point Project, included construction of a connecting road between Point View Drive and Smith Flat Road to provide access to the property from Highway 50. The City prepared a mitigated negative declaration (MND) for the project (the North Point MND).

The North Point MND identified a number of potentially significant adverse impacts of the project, including the introduction of commercial activities among residential uses, increased water runoff, alteration of air movement and microclimatic changes, increased traffic, removal of "virtually all onsite vegetation," adverse effects to an onsite wetland, noise increases during construction, and the creation of light and glare. However, the North Point MND also identified mitigation measures that would reduce these impacts to a less than significant level.

Like the various other projects submitted to the City for the property, the North Point Project was never constructed. In March 2004, the City prepared an Initial Study/Mitigated Negative Declaration (the 2004 IS/MND) for a new project on the property, the Gateway Project, sponsored by real party in interest Edward Mackay. The 2004 IS/MND described the Gateway Project as "a 102-room hotel (Holiday Inn Express) with convention facilities," "a 6 pump gas station with a 9,240 square foot convenience store and attached

carwash including parking, landscaping, grading and stream channel realignment." The 2004 IS/MND further explained: "On and offsite improvements include grading for drainage, building and road construction. Grading on and offsite is expected to result in the filling of approximately 1.4-acres seasonal and riparian wetlands that are located in the north and northeastern most portion of the project site. Additionally, a modification (realignment) to the existing unnamed intermittent drainage channel that traverses the wetlands is proposed."

Plaintiff Save Our Neighborhood is "an ad hoc, unincorporated association of concerned neighborhood residents" who live in the vicinity of the Gateway Project. The remaining plaintiffs, Scott Cooney, Bill Crim, Janet Kelly, Stephen Cox, and Lyn Eastwood, are members of Save Our Neighborhood and live in Smith Flat.

The City conducted two public hearings on the 2004 IS/MND and adjourned a third hearing to allow City staff to review written comments submitted by Save Our Neighborhood, which challenged the use of a negative declaration and called for the preparation of an environmental impact report (EIR) instead. Following review, City staff recommended use of an addendum to the North Point MND rather than an EIR or MND. Staff concluded an addendum was appropriate because none of the conditions requiring preparation of a supplemental EIR or MND are presented.

An addendum to the North Point MND was prepared on May 11, 2004 (the Addendum). The Addendum indicated the Gateway Project involved only "minor changes" to the North Point Project. It compared the environmental impacts and mitigation measures of the two projects. It made the following findings:

"There are no substantial changes proposed by the revised site plan that require major revisions of the existing [MND], or preparation of an EIR due to the involvement of new significant environmental effects. As illustrated above, the project involves minor modifications to the previously studied and approved site plan and actually reduces somewhat the intensity of those uses somewhat.

"There have also been no changes in the circumstances that would result in new significant environmental effects. The site remains unchanged from that previously analyzed and additional environmental review is not necessary. [Citation.]

"There are no substantial changes to the mitigation measures proposed for adoption and applicable to the Gateway [P]roject. Certain of the mitigation measures have been clarified and made more specific. These mitigation

measures, however, are generally consistent with those incorporated into the project as approved in 1997."

On August 24, 2004, the Placerville City Council, and in particular council members Kathi Lishman, Robby Colvin, Pierre Rivas, and Marian Washburn, approved the Gateway Project, adopting findings and conditions of approval recommended by City staff. Those findings and conditions of approval included findings of consistency with various elements and policies of the City's general plan. Regarding CEQA, the findings included the following:

"A. The [North Point MND] adopted for the previous, larger version of the hotel and gas station project, which concluded that all potentially significant environmental impacts could be reduced to a less than significant level through the implementation of mitigation measures approved and adopted by the City, is still legally valid. [¶] . . . [¶]

"C. No new significant or substantially more severe environmental effects would be created by the applicant's proposed modifications to the originally approved project; nor would changed circumstances since the completion of the above-referenced negative declaration give rise to any new significant or substantially more severe environmental effects; nor is there new information of substantial importance, which was not known and could not have been known at the time the previous negative declaration was adopted, showing that the project will have any new significant or substantially more severe environmental effects."

The conditions of approval attached to the Addendum included various measures included with the North Point MND. Also included were various building, planning and engineering division requirements as well as requirements to comply with directives of the El Dorado County Irrigation District, the El Dorado County Fire Protection District and California Department of Transportation (Caltrans). Finally, the conditions of approval included various city council requirements, such as providing "a detached sidewalk, whenever feasible, parallel to the Point View/Jacquier road extension," converting at least 10 parking spaces into landscaped planters, locating utilities outside a proposed .32-acre willow riparian restoration area, and installing a " 'Not a Through Street' or 'No Outlet' sign at the new connector at the Jacquier Road entrance to the Point View Drive/Cardinal Drive neighborhood."

On August 25, 2004, the City issued a notice of determination regarding approval of the Gateway Project.

On September 24, 2004, plaintiffs filed this action against the City, the Placerville City Council, and the individual members of the city council who

voted to approve the Gateway Project. The complaint sought a writ of mandate compelling defendants to vacate the notice of determination and approval of the Gateway Project as well as all other matters associated with that project. Plaintiffs also sought an injunction against any actions taken pursuant to the Gateway Project. The complaint, as amended, alleged the project approvals violated CEQA, planning and zoning laws, and the public trust doctrine.

The trial court denied the petition for writ of mandate and entered judgment for defendants. The court concluded substantial evidence supports the City's choice to use an addendum to the North Point MND, both the North Point MND and the Addendum address the issues raised by plaintiffs, and substantial evidence supports the conclusions reached in those documents. The court further concluded substantial evidence supports the City's conclusion the Gateway Project complies with the City's general plan and the City considered the public trust with respect to water resources on the project site.

## DISCUSSION

### I

### *Introduction*

Plaintiffs challenge the various actions taken by the City and, in particular, the city council in connection with approval of the Gateway Project. They contend defendants failed to comply with the requirements of CEQA, the Gateway Project is inconsistent with the City's general plan, and the project conflicts with the public trust doctrine. We begin with plaintiffs' CEQA claims.

### II

### *CEQA*

■ Plaintiffs contend defendants were required by CEQA to prepare an EIR for the Gateway Project rather than rely on an addendum to the North Point MND. As a general matter, CEQA requires the preparation of an EIR whenever a public agency proposes to approve or carry out a project that may have one or more significant impacts on the environment. (§§ 21080, 21100, 21151.) If the public agency determines the project will not have significant environmental impacts, it may instead prepare a negative declaration. (§ 21080, subd. (c).)

■ Where a project for which an EIR or negative declaration has been prepared is later modified or the circumstances under which it is to be carried out change, a subsequent or supplemental EIR or negative declaration may be required. Section 21166 states:

"When an [EIR] has been prepared for a project pursuant to this division, no subsequent or supplemental [EIR] shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:

"(a) Substantial changes are proposed in the project which will require major revisions of the [EIR].

"(b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the [EIR].

"(c) New information, which was not known and could not have been known at the time the [EIR] was certified as complete, becomes available."

Although section 21166 speaks in terms of an EIR, it is augmented by section 15162 of the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.; hereafter Guidelines), which imposes the same obligation on a project for which a negative declaration was prepared. It reads:

"(a) When an EIR has been certified or a negative declaration adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following:

"(1) Substantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

"(2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

"(3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the

time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:

"(A) The project will have one or more significant effects not discussed in the previous EIR or negative declaration;

"(B) Significant effects previously examined will be substantially more severe than shown in the previous EIR;

"(C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

"(D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative." (Guidelines, § 15162, subd. (a).)

■ Where changes in a project are not substantial enough to require a subsequent or supplemental EIR, the agency may instead prepare "a subsequent negative declaration, an addendum, or no further documentation." (Guidelines, § 15162, subd. (b).) Guidelines section 15164, subdivision (b), reads: "An addendum to an adopted negative declaration may be prepared if only minor technical changes or additions are necessary or none of the conditions described in [Guidelines] Section 15162 calling for the preparation of a subsequent EIR or negative declaration have occurred."

■ The purpose behind the requirement of a subsequent or supplemental EIR or negative declaration is to explore environmental impacts not considered in the original environmental document. (*Fund for Environmental Defense v. County of Orange* (1988) 204 Cal.App.3d 1538, 1544 [252 Cal.Rptr. 79] (*Fund for Environmental Defense*).) " '[Section] 21166 comes into play precisely because in-depth review has already occurred, the time for challenging the sufficiency of the original EIR has long since expired (§ 21167, subd. (c)), and the question is whether circumstances have *changed* enough to justify *repeating* a substantial portion of the process.' " (*Ibid.*) The event of a change in a project is not an occasion to revisit environmental concerns laid to rest in the original analysis. Only changed circumstances, and any additional environmental impacts they cause, are at issue.

The primary thrust of plaintiffs' CEQA challenge in this matter is that use of an addendum was inappropriate because the Gateway Project did not

involve minor technical changes or additions to the North Point Project but instead introduced substantial changes that will result in "new significant environmental effects or a substantial increase in the severity of previously identified significant effects." (Guidelines, § 15162, subd. (a)(1).) Plaintiffs point to, among other things, a substantial increase in grading and soil removal, increased tree removal, and additional watershed changes.

However, as a threshold matter, plaintiffs contend, as they did in the trial court, that section 21166 and the related CEQA guidelines have been erroneously cast in the leading role in this dispute, because the Gateway Project is not a modification of the North Point Project but a new project altogether. Plaintiffs argue "the two projects are *unrelated*, except that they both include hotels and are located on the same land." According to plaintiffs, Guidelines section 15162 "does not even contemplate City's attempt to employ a previous environmental document covering a *different* project—be it 'related' or unrelated—for analysis of the new project's new impacts."

Defendants and real party in interest (hereafter respondents) contend plaintiffs' claim that the two projects are unrelated is "absurd," inasmuch as the projects involve the same land and the same mix of uses and connector road. They argue the question on appeal is whether the City had a rational basis for concluding the two projects are related.

Plaintiffs have the better argument. We do not accept respondents' suggestion that the question on appeal is whether the City had a *rational basis* for concluding the two projects are related. Respondents cite no authority for this standard of review. The question here is not whether the City properly concluded the two projects are related but whether section 21166 applies to a situation such as that presented here, where a new project is proposed that has many of the same characteristics as an earlier project approved for the same site. This is a question of law for the court. (See *Benton v. Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1475, 1477 [277 Cal.Rptr. 481] (*Benton*).)

Section 21166 refers to "a project." It requires a subsequent or supplemental EIR if there are substantial changes proposed for "the project" or substantial changes occur in the circumstances under which "the project" is to be undertaken. (§ 21166, subds. (a) and (b).) None of the reported cases that have discussed section 21166 in connection with a modification to a project or the surrounding circumstances has involved a new project proposed for a site where a similar project was previously approved.

Respondents cite several cases that, they argue, support use of an addendum under the circumstances presented here. In *Fund for Environmental Defense, supra,* 204 Cal.App.3d 1538, the county board of supervisors approved a use permit for Nichols Institute Research Laboratories to develop a medical research and laboratory complex on 100 acres adjacent to a wilderness park. An EIR had been prepared covering the project and an amendment to the county general plan. Years later, after the use permit expired, Nichols applied for a new permit for the project. By then, the rest of the land surrounding the project site had been dedicated to the wilderness park. The new use permit was approved without preparation of a subsequent or supplemental EIR. (*Id.* at pp. 1542–1543.)

The plaintiffs challenged the board's approval of the new use permit, arguing that changed circumstances required a supplemental EIR. Applying section 21166, the Court of Appeal disagreed with the plaintiffs, finding no evidence that the changed circumstances resulted in changed environmental impacts. (*Fund for Environmental Defense, supra,* 204 Cal.App.3d at p. 1552.)

In *Benton, supra,* 226 Cal.App.3d 1467, Whitbread of California obtained a use permit to build a winery on an 856-acre parcel. The county issued an MND for the project. The next year, Whitbread acquired an adjoining 120-acre parcel and applied for another use permit to relocate the winery on the enlarged site and make other changes. The new use permit was issued with a new MND that considered only the changes to the project. (*Id.* at pp. 1473–1474.)

The trial court rejected a challenge by nearby residents to the approval, and the Court of Appeal affirmed. The appellate court concluded the new application involved a modification of the original winery project, not a new project. The court further concluded the board properly relied on a new MND rather than a supplemental EIR. (*Benton, supra,* 226 Cal.App.3d at pp. 1482–1483.)

In *Snarled Traffic Obstructs Progress v. City and County of San Francisco* (1999) 74 Cal.App.4th 793 [88 Cal.Rptr.2d 455] (*Snarled Traffic*), the city approved a project in 1988 to tear down a two-story parking structure and replace it with a seven-story parking structure with 330 spaces and 10,000 to 13,000 square feet of retail space. A negative declaration was prepared for the project. For whatever reason, the project remained dormant until 1997, when the city began working on a modified version of the new parking structure that would be shorter and contain only 200 spaces and no retail space. The City concluded no material change in the circumstances impaired the validity of the original negative declaration, and the project was approved without further environmental review. (*Id.* at pp. 795–796.)

Applying Public Resources Code section 21166 and Guidelines section 15162, the Court of Appeal concluded substantial evidence supported the City's determination that "the revised proposal did not involve 'new significant environmental effects or a substantial increase in the severity of previously identified significant effects' . . . ." (*Snarled Traffic, supra,* 74 Cal.App.4th at p. 801.)

*Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689 [7 Cal.Rptr.3d 868] (*Santa Teresa*) involved a waste treatment facility and pipeline system to carry recycled water in the "Golden Triangle" region that included parts of San Jose, Milpitas and Santa Clara, with future expansion outside the area. A major concern of using recycled water was that it might eventually find its way into the local drinking water supply. An EIR was certified in 1993 that included "project level" analysis of the impacts on local drinking water inside the Golden Triangle but "program level" analysis of impacts outside that area. (*Id.* at p. 696.)

Phase 2 of the project involved expansion of pipelines outside the Golden Triangle area in several directions. An initial study for phase 2 was completed in 2000 and a negative declaration was adopted. However, in 2001, a new route for one of the pipelines in the expansion area was proposed to accommodate a new power generating facility. An initial study concluded that there would be no new environmental impacts from this change, and this study was adopted as an addendum to the original EIR. (*Santa Teresa, supra,* 114 Cal.App.4th at pp. 698–699.)

In upholding the project approval, the Court of Appeal concluded the most recent pipeline project was part of the overall program described in the original EIR rather than a new project. Therefore, section 21166 applied. (*Santa Teresa, supra,* 114 Cal.App.4th at p. 704.) The court further concluded substantial evidence supported the city's decision to rely on an addendum. (*Id.* at p. 706.)

Finally, in *River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154 [43 Cal.Rptr.2d 501] (*River Valley*), the city certified an EIR for a light rail project that used a raised berm in segments and ran through a golf course. (*Id.* at pp. 159–161.) A year later, the project was changed by raising the elevation of the berm along a limited stretch of the project and replacing the golf course with a wetland. The area involved in this change was relatively small compared to the overall project size. The city declined to prepare a supplemental EIR for the revised project and instead relied on an addendum. (*Id.* at pp. 159–161, 175.)

The Court of Appeal concluded the decision to rely on an addendum was supported by substantial evidence, because the changes did not introduce significant new environmental impacts. (*River Valley, supra,* 37 Cal.App.4th at pp. 177–178.)

Respondents contend "[t]hese cases show an agency can adopt an addendum, rather than preparing an EIR, even if the project changes from the one the agency previously analyzed and approved." This may be so. However, they do not stand for the proposition that an addendum may be used if the project is replaced by another project that happens to be similar in nature. Each of the cases cited by respondents involved only one project that underwent changes after completion of the initial environmental review.

The City originally prepared the 2004 IS/MND for the Gateway Project. It made no mention of the North Point Project. Only after the City met resistance from Save Our Neighborhood did it decide to treat the Gateway Project as a modification of the North Point Project. In a May 12, 2004, memorandum, Steve Calfee, the City's Community Development Director, informed the city planning commission that the City staff had reviewed CEQA and the "current and previous environmental documents prepared for this project" and concluded an addendum was appropriate. Calfee stated "the project" underwent environmental review in 1996 and 1997. He referred to the project as the "modified Gateway Hotel Project and Gas Station."

The Addendum itself states the Gateway Project "involves only minor changes to the original project, then known as the North Point Travel Center." The Addendum concluded: "The minor alterations to the project proposed under the revised site plan are not substantial and do not require major revisions to the [2004] IS/MND. . . ." The findings and conditions of approval state: "The Mitigated Negative Declaration adopted for the previous, larger version of the hotel and gas station project . . . is still legally valid."

Although planned for the same land and involving similar mixes of uses, the North Point Project and the Gateway Project are different projects nonetheless. They have different proponents and there is no suggestion the latter project utilized any of the drawings or other materials connected with the earlier project as a basis for the new configuration of uses. The addendum describes the differences in the projects as follows:

"The North Point [P]roject was described in the 1996 IS/MND as a gas station, convenience store with car wash, restaurants, lounge and 106-unit motel. The North Point project included 15,000 square feet of retail uses.

"The Gateway [P]roject does not include separate restaurants or a lounge or other retail uses. The hotel will include only 102 units. The hotel will also include convention facilities.

"The North Point [P]roject identified the need for a connector road between Point View Drive and Smith Flat Road.

"The Gateway [P]roject retains this connector. The connector is now described as a new extension of Jacquier Road between Point View Drive and Smith Flat Road.

"The MND for the North Point [P]roject stated that wetlands would need to be filled and the stream channel realigned, but did not provide details.

"The Gateway [P]roject still requires on-site wetlands and realigning the stream channel on the site. Additional details have been developed regarding these activities and corresponding mitigation."

█ The question under Public Resources Code section 21166 and Guidelines section 15162 is whether changes in a project or its surrounding circumstances introduce new significant environmental impacts. However, a threshold question is whether we are dealing with a change to a particular project or a new project altogether. Public Resources Code section 21166 and Guidelines section 15162 apply to the former but not the latter. Despite the City's self-serving statements in the Addendum that the Gateway Project is a modification of the North Point Project, the totality of the circumstances proves otherwise. The Gateway Project is no more a modified version of the North Point Project than the North Point Project was a modified version of any of the several projects that preceded it for the property. Public Resources Code section 21166 and Guidelines section 15162 are therefore not applicable to this case, and the City violated CEQA in relying on an addendum rather than independent environmental review.

### III

*Other Claims*

Plaintiffs contend the Gateway Project violates the City's general plan and the public trust doctrine. However, because we conclude the City's reliance on an addendum to the North Point MND violated CEQA, plaintiffs' petition challenging the project approval must be granted and the approval set aside. Therefore, we have no occasion to consider plaintiffs' other contentions.

## DISPOSITION

The judgment denying plaintiffs' petition for writ of mandate is reversed and the matter is remanded to the trial court with directions to grant the petition. Plaintiffs shall receive their costs on appeal.

Morrison, Acting P. J., and Butz, J., concurred.

A petition for a rehearing was denied July 19, 2006, and the petition of defendants and respondents for review by the Supreme Court was denied September 27, 2006, S145686. Kennard, J., and Baxter, J., were of the opinion that the petition should be granted.