[No. B194309. Second Dist., Div. Two. Aug. 3, 2007.]

MANI BROTHERS REAL ESTATE GROUP et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES et al., Defendants and Appellants;
IDS EQUITIES, LLC, Real Party in Interest and Appellant.

COUNSEL

Brown, Winfield & Canzoneri, Thomas F. Winfield and Diana J. Vernazza for Plaintiffs and Appellants.

Rockard J. Delgadillo, City Attorney, and Siegmund Shyu, Deputy City Attorney, for Defendants and Appellants the City of Los Angeles and the City Council of the City of Los Angeles.

Rockard J. Delgadillo, City Attorney, Timothy J. Chung and Miguel A. Dager, Deputy City Attorneys, for Defendant and Appellant Community Redevelopment Agency of the City of Los Angeles.

DLA Piper US, Amy G. Nefouse and Whitney Stevens for Real Party in Interest and Appellant.

OPINION

**BOREN, P. J.**—This case involves changes in the plan for a large real estate development project in downtown Los Angeles and compliance with the requirements of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).[1] The underlying issue is whether the original 1989 environmental impact report (EIR) with an updated 2005 addendum is sufficient, or whether the changes in the plan are such that it constitutes an entirely "new project" requiring a new EIR or, alternatively, whether the changes in the project trigger such new and significant environmental impacts that a supplemental EIR (SEIR) must be prepared.

Mani Brothers Real Estate Group and 8th & Francisco, LLC (collectively, Mani Brothers), rival developers and landowners, challenge the project. Mani Brothers contend that the "Modified Project" is so different as to constitute a new project, and that it will have new or more severe environmental effects than the originally approved project due to an increase in square footage, building height, and a change in use from office to residential.

However, we find that the focus on whether the changes amount to a "new project" is not determinative under CEQA. Under the applicable substantial evidence standard of review, but for the issue of police services, the Modified Project's substitution of residential use in place of some office, retail, and cultural uses results in fewer significant impacts compared to the "Original

---

[1] Unless otherwise indicated, all further statutory references are to the Public Resources Code.

Project," even though the overall square footage and floor area are somewhat larger in the Modified Project.

We thus affirm the judgment of the trial court denying a peremptory writ of mandate and upholding (except as to the issue of police services) the decision of the City of Los Angeles, the City Council of the City of Los Angeles, and the Community Redevelopment Agency of Los Angeles (CRA) (collectively referred to as the City) to approve the Modified Project (with the "2005 Addendum") by IDS Equities, LLC, and to require an SEIR on only one issue. The trial court properly granted a peremptory writ of mandate limited to ordering "a SEIR that deals with the necessity for increased police services required by the new, predominately residential project, as opposed to the old, commercial project that was approved by the 1989 EIR."

## FACTUAL AND PROCEDURAL SUMMARY

*Overview of the Original Project and the 1989 EIR.*

The project in question is located on approximately 6.3 acres in downtown Los Angeles, an area generally bounded by the Harbor Freeway, the Ninth Street (renamed James M. Wood Boulevard) northbound freeway off-ramp, Francisco Street, and Eighth Street. The project is in a central business district redevelopment area and is currently vacant land used for parking lots.

The Original Project was reviewed under CEQA. In 1989, an EIR was certified by the CRA, a public agency charged with attracting private investment in economically depressed areas (Health & Saf. Code, § 33000 et seq.), which must review and approve all projects in the central business district before a building permit can be issued. The CRA acted as the "lead agency" on the project under CEQA Guidelines (see Cal. Code Regs., tit. 14, §§ 15050, 15051; hereinafter, Guidelines) and was responsible for ensuring compliance with CEQA and for certifying the final EIR (FEIR). The Original Project analyzed in the 1989 EIR consisted of five buildings with approximately 2.7 million square feet of development, including offices, a 550- to 770-room hotel, retail facilities, and an optional cultural center. The structures included three 30-story towers, one 36-story tower, and one seven-story building.

The 1989 EIR discussed the environmental impact in numerous areas, such as land use and planning, urban design and historic resources, shadow and wind, transportation, circulation and parking, climate and air quality, noise, energy, hazardous materials, public services and utilities, employment, housing, and fiscal factors. The EIR recommended mitigation measures for certain impacts and examined alternatives, but concluded that even with mitigation

measures, the project "would result in unavoidable significant adverse impacts in the areas of traffic generation, air quality, and increased demand for water, sewer capacity, solid waste, and the provision of police and fire services."

*Approvals for the Original Project, and then delays and changed real estate market conditions.*

In 1990, the CRA approved the Original Project, including an owner participation agreement (OPA), with a public benefits plan and a transfer of floor area ratio (TFAR) plan, and it adopted CEQA findings. Later in 1990, the Los Angeles City Council reviewed and approved the TFAR plan and ratified the OPA for the project with the developer of the Original Project, City Center Development. In 1992, the City and the developer of the Original Project entered into a development agreement.

The Original Project analyzed under CEQA entailed several approvals over the course of time. Some of the CRA and City approvals have occurred, such as approval of the concept master plan, but other approvals have not yet occurred, such as approvals of the concept design drawings and certificates of completion. Full implementation of the project was delayed by litigation (see *A Local & Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773 [16 Cal.Rptr.2d 358]), which left the developer in what was then a weak real estate leasing market in the early 1990's.

Between 1994 and 2003, the project's OPA was refined several times by five implementation agreements, extending the time for the developer's performance. The project was also revised in 2000 to change some of the conditions of approval related to the subsurface of certain streets. The CRA prepared a CEQA addendum (the 2000 Addendum) for the project revisions approved at that time. The 2000 Addendum also updated the FEIR analysis and conclusions by evaluating if "changes in environmental or regulatory conditions have the potential to alter the findings regarding the project's impacts contained in the previously certified FEIR."

As part of the fifth and final implementation agreement, the CRA required the project developer to undertake a market study to analyze current market conditions and recommend a possible revised approach to the project. In October of 2003, the market study was completed and submitted to the CRA. The market study indicated, in pertinent part, that there was a strong demand for residential development in the downtown area.

*The 2005 Addendum.*

In light of the changed and improved real estate market conditions indicating a transition to a residential and mixed-use environment, in May of

2004, the project developer formally requested that the CRA revise the project to permit residential uses. The CRA, acting as the lead agency, initiated an assessment of whether additional review under CEQA was required for the purposes of a modified project. Because the project had already been the subject of an FEIR, pursuant to section 21166 and Guidelines sections 15162 through 15164, the CRA analyzed whether any conditions required the preparation of an SEIR. The CRA determined, in pertinent part, that because there were no new or more significant environmental impacts than had been previously evaluated in the original EIR, and because the project developer had not refused to implement any appropriate mitigation measures, the changes in the project were such that no major revision to the FEIR (as updated by the 2000 Addendum) was required.

Thus, the CRA prepared a 2005 Addendum to the Original Project's FEIR. The 2005 Addendum was an approximately 390-page document (exclusive of lengthy technical appendices) analyzing the impacts of the Modified Project in comparison to the impacts of the previously approved Original Project. The Modified Project would reduce much of the Original Project's office and retail space, and eliminate the optional cultural use component, while maintaining the hotel component and adding residential components. As a result of these changes, the overall size of the project would increase from approximately 2.7 million square feet to a maximum of just over 3.2 million square feet.

The additional density would be made possible by a TFAR from the nearby convention center, a process authorized by the Los Angeles Municipal Code whereby development rights can be transferred within the central business district. Using a TFAR entails a monetary benefit to the City because, pursuant to the restated OPA approved as a part of the Modified Project, the developer would pay between $5.8 million and $23.3 million, depending upon the amount of increased density used, with the proceeds split between the City and the CRA and used to provide affordable housing.

As indicated in the 2005 Addendum, the Modified Project would consist, in pertinent part, of the following: (1) one 360-unit residential building with a maximum height of 350 feet, open space plazas and recreational space; (2) a second residential and retail building with a maximum height of 500 feet, up to 388 units, open spaces and terraces; (3) a third residential and hotel tower with a maximum height of 620 feet, up to 88 residential units and 480 hotel rooms, open space, recreation areas and terraces; and (4) a fourth building with a maximum height of 620 feet and approximately one million square feet of office, approximately 11,325 square feet of retail, and additional open space. The Modified Project would encourage pedestrian use of Francisco Street and Eighth Street by providing a plaza, ground level retail space, and pedestrian amenities such as lighting, landscaping and outdoor sculptures.

As further indicated in the 2005 Addendum, although the changes in the project would increase the overall size of the project by approximately 18.5 percent, the project's environmental impacts actually would be reduced. Environmental impacts would be reduced because residential development tends to cause fewer impacts compared to retail or office development, primarily because residential development would generate significantly less traffic. By introducing residential features, the Modified Project would reduce vehicular trips by approximately 50 percent in comparison to the Original Project. According to the 2005 Addendum, the changes in the Modified Project would lessen many of the environmental impacts that were deemed significant and unavoidable in the Original Project, such as impacts on traffic, water supply, water and wastewater treatment facilities, and landfill capacity.

*Police protection services.*

The 1989 EIR had deemed the impact of the Original Project on the need for police protection services to be "significant and unavoidable." As set forth in the 1989 certified EIR, appropriate mitigation measures would entail (1) consultation with the Los Angeles Police Department (LAPD) crime prevention unit on design and implementation of a security plan, and (2) the proper illumination of elevators, lobbies and parking areas.

The 2005 Addendum acknowledged that the Modified Project would result in a "somewhat greater" demand for police protection services because of the residential component of the project with approximately 1,714 new residents, apart from the additional people associated with the commercial component of the project. "This is considered a potentially significant impact." Nonetheless, the 2005 Addendum found that the Modified Project, with its now largely residential character, would have a "less than significant impact" on the need for police services with certain mitigation measures implemented.

As explained in the 2005 Addendum, the Modified Project, *like the Original Project,* would include design features intended to reduce the need for police protection services. For example, the Modified Project would include private security guards, electronic surveillance equipment, and electronic card keys for after-hours access to the buildings and parking structures. The Modified Project also would be located in an area that provides an additional security team, known as the "Purple Patrol," which works in coordination with the LAPD to ensure the safety of the downtown area.

Regarding police services, the 2005 Addendum concluded as follows: "With these project features and measures, impacts on police protection services associated with the Modified Project would be less than significant. Additionally, given that future projects would be required to undergo LAPD

review on an individual basis, and the reasonable expectation that adequate funding of facility needs would continue to be maintained through the City's budgeting process, including increases in tax revenue through future projects, cumulative impacts on police protection services would be less than significant. This is in contrast to the Certified EIR's findings where project and cumulative impacts on police protection were identified as unavoidable, significant and adverse."

The 2005 Addendum only identified two significant and unavoidable impacts of the Modified Project: air quality and construction noise, both of which were impacts previously disclosed in the FEIR and the 2000 Addendum. All other impacts of the Modified Project—including the impact on police services, which was previously found to be significant and unavoidable—were determined to be less than significant.

*The approval process for the Modified Project.*

The ensuing approval process for the Modified Project and the 2005 Addendum included several public meetings before the CRA and the City. In October of 2005, the CRA board certified the 2005 Addendum and approved the Modified Project, and then gave the requisite statutory notice of its approval of the Modified Project.

Several months later, the owner of the project sold the project to another entity, IDS Equities (real party in interest in the present appeal). Thereafter, pursuant to an assignment and assumption agreement in November of 2005, LA Metropolis became the participant in the restated OPA and is the current owner and developer of the project.[2]

After the CRA approved the Modified Project, the CRA sent to the city council appropriate documentation so that it could review the Modified Project and the 2005 Addendum and approve the restated OPA, as required by law. (See L.A. Admin. Code, § 8.99.04, subds. (g), (*o*), (p).) The CRA also requested, in pertinent part, that the City direct its share of the TFAR payment into the City's affordable housing trust fund.

Beginning in December of 2005, the city council held public meetings and then approved the Modified Project and directed the filing of a notice of determination on the Modified Project.

---

[2] Apparently, the parties never formally sought to substitute LA Metropolis for IDS Equities.

*The superior court upheld the Modified Project and the 2005 Addendum, except as to the analysis of police services.*

In January of 2006, Mani Brothers filed a petition for a writ of mandate, challenging the 2005 Addendum and the approval of the Modified Project. The trial court denied the writ petition and upheld the 2005 Addendum and the Modified Project in all respects, except as to the analysis of the impacts related to police services. The court entered judgment granting a peremptory writ of mandate ordering "a SEIR that deals with the necessity for increased police services required by the new, predominately residential project," but finding that "the project is in compliance with CEQA, and the petition is denied on all grounds alleged therein other than the alleged failure to provide for the necessity of increased police protection purposes."

Mani Brothers appeal, contending essentially that the trial court erred in not granting the petition mandating the preparation of a new EIR or an SEIR on all of the project's environmental impacts. The City cross-appeals on the issue of police services, contending that the Modified Project and the 2005 Addendum complied with CEQA in all respects.

## DISCUSSION

I. *Mani Brothers satisfied the requirement of the exhaustion of administrative remedies.*

The City contends that Mani Brothers failed to establish the jurisdictional prerequisite of exhaustion as to nearly all the issues raised. The City notes that Mani Brothers appeared during the city council's approval process on the Modified Project by submitting, through their attorneys, four short letters and speaking through their counsel at one city council committee hearing and at two city council hearings. According to the City, these communications improperly asserted only in the most general terms that the changes associated with the Modified Project and the changes in circumstances required preparation of an SEIR.

■ The rationale for exhaustion is that the agency " 'is entitled to learn the contentions of interested parties before litigation is instituted. If [plaintiffs] have previously sought administrative relief . . . the [agency] will have had its opportunity to act and to render litigation unnecessary, if it had chosen to do so.' " (*Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 162–163 [217 Cal.Rptr. 893].) The "exact issue" must have been presented to the administrative agency to satisfy the exhaustion requirement. (*Resource Defense Fund v. Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 894 [236 Cal.Rptr. 794].)

However, "less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding" because, although not the case here, parties in such proceedings generally are not represented by counsel. (*Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo, supra,* 172 Cal.App.3d at p. 163.)

■ Pursuant to the CEQA statutory scheme, only parties who object to the agency's approval of the project either orally or in writing may thereafter file a petition. (§ 21177, subd. (b).) In any action or proceeding alleging noncompliance with CEQA, the grounds alleged for noncompliance must first have been "presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination." (§ 21177, subd. (a).)

In the present case, when the CRA prepared the 2005 Addendum, it did not provide for a public comment period or provide the public with notice that it was preparing an addendum. Also, neither the CRA nor the City provided a public hearing on the 2005 Addendum under CEQA, and the City acknowledges "there was no formal public comment period on the 2005 Addendum."[3] However, several meetings were held. They were not duly noticed public hearings under CEQA, but were regularly scheduled meetings of the CRA or the City that were open to the public. As the City correctly explains, the exhaustion requirement nonetheless applies because the public meetings held constituted an *"other opportunity* for members of the public to raise . . . objections orally or in writing prior to the approval of the project." (§ 21177, subd. (e), italics added.)

Because Mani Brothers repeatedly voiced their objections to the 2005 Addendum at various relevant meetings, the exhaustion requirement was satisfied. Mani Brothers raised their concerns about the use of an addendum to evaluate the changed project at meetings of the city council and the housing, community and economic development committee. In written and oral comments, Mani Brothers raised their concerns regarding the project's impacts on air quality, public services, traffic, congestion, parking, aesthetics, and shade and shadow.

For example, in a letter to the city council dated December 21, 2005, Mani Brothers noted, in pertinent part, "These differences and the others reflected

---

[3] Pursuant to the CEQA statutory scheme, an addendum, unlike an EIR or an SEIR, "need not be circulated for public review but can be included in or attached to the final EIR." (Guidelines, § 15164, subd. (c).) Since, as discussed below, the addendum process was properly used in the present case, there is no merit to the contention by Mani Brothers that the City violated CEQA by excluding the public from the environmental review process.

or permitted in the Amended and Restated OPA create new substantial environmental effects and increase the severity of previously identified effects, such as the impact on public services, traffic and shade and shadow." Similarly, in a February 21, 2006, letter to the city council, Mani Brothers stated: "[T]he Council must prepare a supplemental or subsequent Environmental Impact Report . . . . [¶] . . . These changes will introduce new significant effects on public services, such as fire protection, police protection, schools and parks. . . . The increased heights, as well as the relocation of the buildings' footprints, will affect the shadows cast on the surrounding properties. . . . [¶] . . . These developments have changed the landscape of the Project area, introduced new significant environmental effects, and increased the severity of previously identified environmental effects, such as traffic, congestion, and parking and the provision of police and fire services." The letters to the city council also noted that an addendum does not require public notice or public review, objected that certain mitigation measures had been deleted, and objected to the City's approval of a reduced TFAR payment and the sale of the project to the new developer at a profit to the old developer.

Accordingly, the objections here were more than merely "a relatively few bland and general references" (*Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1198 [200 Cal.Rptr. 855]), and the objections thus were adequate to satisfy the exhaustion requirement. (See, e.g., *East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 176 [258 Cal.Rptr. 147] [comment about the absence of any mention of the " 'most basic concern' " of residents for " 'traffic and safety' " was sufficient notice for exhaustion purposes as to those issues].) The objections by Mani Brothers satisfied the purpose of the exhaustion doctrine, which is to provide the public agency with an "opportunity to receive and respond to articulated factual issues and legal theories *before* its actions are subjected to judicial review." (*Coalition for Student Action v. City of Fullerton, supra,* 153 Cal.App.3d at p. 1198, original italics.)

## II. *Standards of review.*

Because we are reviewing the City's decision against a claim of noncompliance with CEQA, "the scope and standard of the appellate court's review is the same as the trial court's." (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 918 [45 Cal.Rptr.3d 102].) In any action to attack, review, or set aside the decision of a public agency to approve a project based on grounds of noncompliance with CEQA, where a hearing was required and a public agency exercised its discretion in making factual determinations, we do "not exercise [our] independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in the light of the whole record." (§ 21168; see also

§ 21168.5 [in other situations, "the inquiry shall extend only to whether there was a prejudicial abuse of discretion"].)

For CEQA purposes substantial evidence is defined by statute as including "fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact." (§ 21080, subd. (e)(1).) The applicable Guideline further explains that substantial evidence includes "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made that the project may have a significant effect on the environment is to be determined by examining the whole record before the lead agency." (Guidelines, § 15384, subd. (a).) Substantial evidence does not include "[a]rgument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment." (*Ibid.*)

To the extent there are questions about whether substantial evidence exists, "[t]he agency is the finder of fact and a court must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision." (*Gilroy Citizens for Responsible Planning v. City of Gilroy, supra,* 140 Cal.App.4th at p. 918; see also *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 [253 Cal.Rptr. 426, 764 P.2d 278].)

Accordingly, Mani Brothers have the burden here to demonstrate that the City's decision to approve the Modified Project with the 2005 Addendum, rather than to require an SEIR, is not supported by substantial evidence and was thus improper. (§ 21168; Guidelines, § 15384, subd. (a).)

III. *Substantial evidence supports the City's decision that the Modified Project will have no new or more severe impacts than the Original Project, and that therefore an SEIR was not required (except as to the issue of police services).*

*General principles regarding use of an SEIR versus an addendum.*

An SEIR is a subsequent version of an EIR that revises the earlier EIR to make it adequate for a project's approval after conditions have changed. No subsequent or supplemental EIR is required by the lead agency unless one of several events occur, the relevant event here being that "[s]ubstantial changes are proposed in the project which will require major revisions of the [EIR]." (§ 21166, subd. (a).) The Guidelines implementing

section 21166 elaborate upon this triggering event, and explain that an SEIR need not be prepared unless "[s]ubstantial changes are proposed in the project which will require major revisions of the previous EIR . . . due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects." (Guidelines, § 15162, subd. (a)(1).)

█ In contrast to an SEIR, an addendum to a previously certified EIR must be prepared "if some changes or additions are necessary but none of the conditions described in Section 15162 calling for preparation of a subsequent EIR have occurred." (Guidelines, § 15164, subd. (a).) An addendum does not need to be circulated for public review or comment but can be included in, or attached to, the FEIR, and it is then considered by the agency before making its decision on the project. (Guidelines, § 15164, subds. (c), (d).)

An addendum may be appropriate for either an EIR or a negative declaration. (Guidelines, § 15164.) In the context of a negative declaration—a declaration that no substantial evidence supports a fair argument that a project may have a significant environmental impact (which was not the case here)—an addendum to an adopted negative declaration is appropriate where "only minor technical changes or additions are necessary." (Guidelines, § 15164, subd. (b).)

When reviewing an agency's decision not to require an SEIR, the "low threshold" fair argument test "for requiring the preparation of an EIR in the first instance is no longer applicable; instead, agencies are prohibited from requiring further environmental review unless the stated conditions are met." (*Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1017–1018 [100 Cal.Rptr.2d 413].) Thus, in reviewing decisions made pursuant to section 21166, courts "are not reviewing the record to determine whether it demonstrates a possibility of environmental impact, but are viewing it in a light most favorable to the City's decision in order to determine whether substantial evidence supports the decision not to require additional review." (83 Cal.App.4th at p. 1021.)

The rationale for limiting the circumstances under which a supplemental or subsequent EIR may be prepared is "precisely because in-depth review has already occurred, the time for challenging the sufficiency of the original EIR has long since expired (§ 21167, subd. (c)), and the question is whether circumstances have *changed* enough to justify *repeating* a substantial portion of the process." (*Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1073 [230 Cal.Rptr. 413], original italics.) Therefore, section 21166 "provides a balance against the burdens created by the environmental review process and accords a reasonable measure of finality and certainty to the results

achieved. [Citation.] At this point, the interests of finality are favored over the policy of favoring public comment . . . ." (*Friends of Davis v. City of Davis, supra,* 83 Cal.App.4th at p. 1018.)

Applying the above principles, courts have upheld the use of addenda and not required preparation of an SEIR in numerous contexts that are instructive here. Thus, for example, addenda were properly used in cases where many years had elapsed between the original EIR and later project revisions (see *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689 [7 Cal.Rptr.3d 868] [eight years between certified FEIR and addendum]), and where the project's appearance had changed fairly dramatically (see *Fund for Environmental Defense v. County of Orange* (1988) 204 Cal.App.3d 1538 [252 Cal.Rptr. 79] [designs changed, square footage increased by 30 percent, number of buildings increased, and project site newly surrounded by wilderness park]; *River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154 [43 Cal.Rptr.2d 501] [light rail project changed by raising the elevation of a segment of a berm by a factor of two to three times the original height and replacing a golf course with a wetland]).

*The recent case of* Save Our Neighborhood v. Lishman *(2006) 140 Cal.App.4th 1288 [45 Cal.Rptr.3d 306]* (Save Our Neighborhood) *does not compel a different analysis.*

The extensive reliance by Mani Brothers on the recent case of *Save Our Neighborhood, supra,* 140 Cal.App.4th 1288, does not persuade us to use an analysis different from that discussed above. In *Save Our Neighborhood,* the court dealt with substantial proposed changes in a project, with the new project involving the same land and mixes of use (e.g., motel or hotel, gas station, eating facilities, etc.) but with different proponents using completely different drawings, materials and configurations of structures. The city asserted the project involved only minor changes, filed an addendum to the prior project's mitigated negative declaration, and then approved that addendum for the new project. (*Id.* at pp. 1292–1293.)

The court in *Save Our Neighborhood, supra,* 140 Cal.App.4th at page 1301, found that the "totality of the circumstances" established that the project in question was not a modified version of a prior project, but rather was a new and different project not subject to the legislative and administrative requirements (§ 21166; Guidelines, § 15162), and that the city violated CEQA in relying on an addendum rather than an independent environmental review. (*Save Our Neighborhood, supra,* at p. 1301.) The court thus reversed and remanded the matter and directed the trial court to grant the petition for a writ of mandate, compelling the defendants to vacate the notice of determination, the approval of the project, and all other matters associated with the

project. (*Save Our Neighborhood, supra,* at pp. 1294, 1302.) According to Mani Brothers, the present case, like the situation in *Save Our Neighborhood,* involves an entirely "new project" and mandates not merely an SEIR, but an entirely "new EIR" which "should be subjected to full CEQA review."

██ *Save Our Neighborhood,* however, involved an addendum to a previously certified negative declaration and not, as here, an addendum to a previously certified EIR. That is significant because an addendum is only appropriate to a previously certified negative declaration where "minor technical changes or additions are necessary" (Guidelines, § 15164, subd. (b)) and, as noted before and contrary to the contention of Mani Brothers, this limitation does not apply where the addendum is to a previously certified EIR. (Guidelines, § 15164, subd. (a).) Because in the present case the 2005 Addendum was to the FEIR previously certified for the project, not a previously certified negative declaration, *Save Our Neighborhood* is distinguishable and inapplicable.

Even if *Save Our Neighborhood* was not distinguishable on its facts, its fundamental analysis is flawed. The court in *Save Our Neighborhood* tackled what it perceived to be the "threshold question [of] whether we are dealing with a change to a particular project or a new project altogether," and declared that "section 21166 and Guidelines section 15162 apply to the former but not the latter." (*Save Our Neighborhood, supra,* 140 Cal.App.4th at p. 1301.) This novel "new project" test does not provide an objective or useful framework. Drastic changes to a project might be viewed by some as transforming the project to a *new* project, while others may characterize the same drastic changes in a project as resulting in a dramatically *modified* project. Such labeling entails no specific guidelines and simply is not helpful to our analysis.

The "new project" test in *Save Our Neighborhood,* also inappropriately bypassed otherwise applicable statutory and regulatory provisions (i.e., § 21166; Guidelines, § 15162) when it considered it "a question of law for the court" whether the changed project was to be reviewed under section 21166 at all. (*Save Our Neighborhood, supra,* at p. 1297.) We disagree with that approach and view the issue of whether an agency proceeded properly in treating a project as subject to section 21166 *not* as a question of law, but rather as a question of the adequacy of evidence in the record to support the agency's determination.

The question of law approach employed in *Save Our Neighborhood* conflicts with the customary substantial evidence test discussed above and long used in all other cases. The case of *Benton v. Board of Supervisors* (1991) 226 Cal.App.3d 1467 [277 Cal.Rptr. 481] (ironically cited by *Save Our*

*Neighborhood, supra,* 140 Cal.App.4th at p. 1297, to support the question of law approach used), is instructive. There, the project involved moving a winery to a different site, adding underground storage caves and altering access routes. The appellate court characterized the project as a modification of the prior project, upheld the decision not to prepare an EIR, and found the agency's mitigated negative declaration sufficient. However, the court did so based on an assessment of the environmental effects of the proposed project revisions, not on the magnitude or character of the changes or its treatment of the issue as a question of law. (*Benton v. Board of Supervisors, supra,* 226 Cal.App.3d at pp. 1483–1484.)

Treating the issue as a question of law, as the court did in *Save Our Neighborhood,* inappropriately undermines the deference due the agency in administrative matters. That principle of deference is otherwise honored by the substantial evidence test's resolution of any " 'reasonable doubts in favor of the administrative finding and decision.' " (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 393.)

Most significantly, holding that the court should decide as a matter of law if the later project is a revision of a previously approved project or an entirely new project, *without consideration of the environmental impacts of the later project,* violates the legislative mandate that "courts . . . shall not interpret this division or the state guidelines . . . in a manner which imposes procedural or substantive requirements beyond those explicitly stated in this division or in the state guidelines." (§ 21083.1; see *Maintain Our Desert Environment v. Town of Apple Valley* (2004) 124 Cal.App.4th 430, 445 [15 Cal.Rptr.3d 322].)

The focus of CEQA, both procedurally and substantively, is "solely . . . the potential environmental impacts of a project." (*Maintain Our Desert Environment v. Town of Apple Valley, supra,* 124 Cal.App.4th at p. 445.) Labeling a project a "new" project, as distinguished from a "modified" project, and finding such a label determinative, as the court did in *Save Our Neighborhood,* imposes a new analytical factor beyond the framework of CEQA. Particularly here where there is a previously certified EIR, changes in the size, ownership, nature, character, etc., of a project are of no consequence in and of themselves. Such factors are meaningful *only* to the extent they affect the environmental impacts of a project.

Thus, in the present case, we must hark back to section 21166 and the mandate in the Guidelines that an SEIR need not be prepared unless "[s]ubstantial changes are proposed in the project which will require major revisions of the previous EIR . . . *due to the involvement of new significant*

*environmental effects or a substantial increase in the severity of previously identified significant effects.*" (Guidelines, § 15162, subd. (a)(1), italics added.)

*Whether substantial evidence establishes that an SEIR was required.*

Mani Brothers contend that if no new EIR is required, then at least an SEIR is required. Although Mani Brothers discuss at some length the facts in other cases, they cite no evidence whatsoever to support the bulk of their conclusory assertions. There is thus no support for most of the claims that the Modified Project's increased size, density, or changes in use will introduce "new significant environmental effects or a substantial increase in the severity of previously identified significant effects." (Guidelines, § 15162, subd. (a)(1).)

As with all substantial evidence issues, an appellant challenging the evidence must lay out the evidence favorable to the other side and show why it is lacking. A reviewing court need not independently review the record to make up for an appellant's failure to carry this burden. (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266 [15 Cal.Rptr.3d 176]; see also *Markley v. City Council* (1982) 131 Cal.App.3d 656, 673 [182 Cal.Rptr. 659].)

It is thus unnecessary to review the facts in detail regarding the impact of the Modified Project on such factors as traffic, air quality, construction noise, fire protection services, and the visuals of shade, shadow and view. It is sufficient to note, however, that the City cites to substantial evidence in the administrative record that the Modified Project will not have any new or more severe environmental impacts than previously disclosed (with the exception of police services). Indeed, the substitution in the Modified Project of residential uses in place of some office, retail, and cultural center uses would result in about the same or substantially fewer significant impacts (e.g., traffic) compared to the Original Project, even with an overall increase in square footage and floor area ratio.

Mani Brothers also assert that since the certification of the EIR in 1989, the area surrounding the Modified Project has changed dramatically. Specifically, they note the development of the Staples Center in 1999, the Walt Disney Concert Hall in 2003, some office and residential developments, the L.A. Live project adjacent to Staples Center and the Grand Avenue project. Even assuming all of those developments are in sufficiently meaningful proximity to the Modified Project—a highly questionable assumption—there is no evidentiary support cited for the notion that those developments will necessarily alter the baseline upon which previously identified impacts should be evaluated.

In fact, the 2005 Addendum specifically noted a list of cumulative related projects, took into consideration "the current environmental setting . . . as the baseline," and analyzed the Original Project and the Modified Project "under the same contemporary baseline conditions." Thus, an SEIR was not required due to cumulative impacts caused by the Modified Project when considered in conjunction with new development in the area. (See § 21166; Guidelines, § 15162.)

■ Nor does the City's decision to delete or revise certain mitigation measures warrant an SEIR. Mitigation measures adopted when a project is approved may be changed or deleted if the agency states a legitimate reason for making the changes and the reason is supported by substantial evidence. (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 359 [110 Cal.Rptr.2d 579].) Here, substantial evidence supports deleting the measures because they are no longer necessary.

For example, the 2005 Addendum explains that the downtown urban core has expanded so that low-rise and mid-rise structures have been replaced with mid-rise and high-rise structures, rendering the height limitation of 30 stories a mitigation that is no longer necessary. Similarly, the Modified Project will have no significant traffic impact on local streets and now provides for onsite parking in excess of City requirements, making participation in the peripheral parking program no longer necessary. The deletion of other mitigation measures, such as a freeway off-ramp improvement measure, a water treatment capacity mitigation measure, and a waste removal mitigation measure, were likewise explained in terms of the recent lack of any significant impact requiring mitigation or the existence of recent external factors obviating the need for the mitigation.

Thus, substantial evidence in the record supports the reasons for the changes in the Modified Project's mitigation measures, and no new or more severe impacts are caused by the deletions or changes to the mitigation measures. Hence, no SEIR was required.

*The impact of the Modified Project on police services.*

In its cross-appeal, the City alleges that the use of an addendum to analyze the Modified Project's impacts on police services complied with CEQA and should be upheld.[4] However, we find the trial court properly granted a peremptory writ of mandate limited to ordering "an SEIR that deals with the

---

[4] In its effort to establish that the Modified Project will purportedly have an insignificant impact on the provision of police services, the City requests that we take judicial notice of

necessity for increased police services required by the new, predominately residential project, as opposed to the old, commercial project that was approved by the 1989 EIR."

The City complains about the trial court's observation that it was "obvious" that "a project that has people living in the downtown area rather than just working in the downtown area, coming in to work and then leaving at night, . . . makes a substantial impact on the amount of police protection." Specifically, the City asserts that the trial court's reliance on such a conclusion as "obvious" amounted to the court's improper application of its own independent judgment of the evidence, rather than using the substantial evidence test and viewing the evidence "in a light most favorable to the City's decision in order to determine whether substantial evidence supports the decision not to require additional review." (*Friends of Davis v. City of Davis, supra*, 83 Cal.App.4th at p. 1021.)

We acknowledge that it is improper for a court to "judge the wisdom of the agency's action in approving the Project or pass upon the correctness of the EIR's environmental conclusions." (*River Valley Preservation Project v. Metropolitan Transit Development Bd., supra*, 37 Cal.App.4th 154, 168.) Rather, the function of a court, whether at the trial or appellate level, is to determine whether the agency followed proper procedures and whether "substantial evidence" supports the agency's determination that changes in the project, or its circumstances, were not sufficient to require an SEIR. (*Ibid.*)

However, the City fails to appreciate that a court may find substantial evidence not only in clearly stated facts, but also from "reasonable assumption[s] predicated upon fact[s]." (§ 21080, subd. (e)(1).) The Guidelines further explain that substantial evidence includes "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made that the project may have a

---

several items. The City requests judicial notice of a 1997 city ordinance and a 2002 City ordinance with an attached 2002 management plan for property based in the business improvement district in the downtown center district of Los Angeles.

Although under certain circumstances it is appropriate to take judicial notice of legislation by local governments (Evid. Code, § 452, subd. (b); see *Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 7 [40 Cal.Rptr.3d 205, 129 P.3d 394]), it is well settled that in a CEQA action challenging the sufficiency of the evidence the court can only review evidence that was actually before the decisionmaking body at the time of its decision. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573, fn. 4 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) Because here the requested materials were not brought before the decisionmaking body and considered by it at the time of the approval of the 2005 Addendum and the Modified Project, we deny the City's request for judicial notice.

significant effect on the environment is to be determined by examining the whole record before the lead agency." (Guidelines, § 15384, subd. (a).)

Viewed accordingly, we find, as did the trial court, that the conclusory assertion in the 2005 Addendum that the Modified Project will have an *insignificant* impact on the provision of police services is not supported by substantial evidence. The 2005 Addendum also stated that both the Original Project and the Modified Project would have an insignificant impact on police services, although the 1989 EIR found that the Original Project would have a *significant and unavoidable* impact on the provision of police services. Additionally, the 2005 Addendum concluded that the Original Project's design features—the same design features considered in the 1989 EIR— would decrease the Original Project's impacts on the provision of police services to a less than significant level.

However, the 2005 Addendum fails to provide evidence as to why the same mitigation measures that the 1989 EIR found would not reduce the Original Project's impacts to less than a significant level somehow do just that. There is also no evidence in the 2005 Addendum as to why it disregarded the LAPD's statement in the 1989 EIR that the Original Project would indeed have a significant impact on the provision of police services.

Regarding mitigation measures, in a similarly conclusory fashion, the 2005 Addendum notes that the Modified Project would increase the demand on the LAPD for police services, but that the mitigation measures would reduce the Modified Project's impacts on police services to less than significant. However, that conclusion is inexplicable because the mitigation measures envisioned are the same mitigation measures considered in the 1989 EIR, which found that such mitigation measures would not reduce the Original Project's impacts on the provision of police services to less than significant. Thus, the 2005 Addendum fails to explain how the mitigation measures, found unable to mitigate the Original Project's impacts in the 1989 EIR, are now magically able to mitigate the impacts of the larger and mostly residential Modified Project.

Accordingly, substantial evidence and reasonable inferences therefrom—specifically, the increased size of the project, the addition of over 800 residential units, and the features designed to encourage pedestrian use of the area—establish that the changes in the Modified Project will increase the Original Project's impact on the provision of police services. The trial court properly found that the City erred in failing to prepare an SEIR to evaluate the Modified Project's impacts as to police services.

## <u>DISPOSITION</u>

The judgment is affirmed. Each party is to bear its own costs on appeal.

Doi Todd, J., and Chavez, J., concurred.