[No. D058329. Fourth Dist., Div. One. Apr. 26, 2012.]

JAMES A. ABATTI et al., Plaintiffs and Appellants, v.
IMPERIAL IRRIGATION DISTRICT, Defendant and Respondent.

COUNSEL

Downey Brand, Gregory Thomas Broderick, Stephen J. Meyer, Kevin M. O'Brien and Courtney S. Covington for Plaintiffs and Appellants.

Allen Matkins Leck Gamble Mallory & Natsis, Davis Leon Osias, David Duval Cooke, Jeffrey R. Patterson, Mark J. Hattam; and Jeffrey M. Garber for Defendant and Respondent.

**OPINION**

**AARON, J.—**

I.

INTRODUCTION

The California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] generally requires that a public agency prepare an environmental impact report (EIR) whenever the agency undertakes a project that may have a significant effect on the environment. (§§ 21100, 21151.) More specifically, "[i]f the agency's initial study of a project produces substantial evidence supporting a fair argument the project may have significant adverse effects, the agency must (assuming the project is not exempt from CEQA) prepare an EIR." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 319 [106 Cal.Rptr.3d 502, 226 P.3d 985].) If the agency determines by way of an initial study that the project will *not* have a significant effect on the environment, the agency may issue a negative declaration to this effect. (*Ibid.*; § 21064.)

Section 21166 provides that once an agency prepares an EIR, no EIR shall thereafter be required for the project unless certain statutorily prescribed circumstances occur, such as substantial changes to the project or to the circumstances under which the project is being undertaken. Guidelines section 15162 (Cal. Code Regs., tit. 14, § 15162)[2] provides a similar limitation on subsequent environmental review following an agency's adoption of a negative declaration. Guidelines section 15162 has been held to be a valid regulation that implements the principles contained in section 21166. (*Benton v. Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1479–1481 [277 Cal.Rptr. 481] (*Benton*).)

In 2006, the Imperial Irrigation District (the District) adopted a resolution related to a plan (Equitable Distribution Plan or EDP or Project) for the distribution of water in the event of an actual or potential shortage of water (2006 EDP Resolution). Concurrently with its adoption of the resolution, the District adopted a negative declaration (2006 Negative Declaration) in which it concluded that the EDP would not have a significant effect on the environment. In 2007, the District adopted regulations implementing the EDP

---

[1] All subsequent statutory references are to the Public Resources Code, unless otherwise specified.

[2] All subsequent references to "Guidelines," are to the regulations guiding application of CEQA contained in title 14 of the California Code of Regulations section 15000 et seq.

(2007 EDP Regulations). In 2008, the District adopted additional regulations (2008 EDP Regulations) that revised the 2007 EDP Regulations. Concurrently with the 2008 EDP Regulations, the District adopted an environmental compliance report that concluded that the 2008 EDP Regulations did not warrant further environmental assessment under CEQA.

Appellants James A. Abatti, Ronald C. Leimgruber, Laura L. Leimgruber, Douglas Westmoreland, Steven Nickus, and Felipe Irigoyen, owners and/or users of agricultural land in Imperial County (appellants), filed a second amended verified petition for writ of mandate/complaint (petition or petition for writ of mandate) in the trial court in which they maintained that the District failed to comply with CEQA in adopting the 2008 EDP Regulations, among other claims.[3] Appellants sought an order directing the District to set aside the 2008 EDP Regulations "until such time as CEQA review has been completed." The trial court held a hearing on the CEQA claim, took the matter under submission, and later issued an order denying the petition as to appellants' CEQA claim. Applying *Benton*, the court concluded that there was substantial evidence to support the District's determination that the adoption of the 2008 EDP Regulations did not require additional CEQA review. After the appellants dismissed their remaining non-CEQA claims without prejudice, the court entered a judgment on the CEQA claim in favor of the District.

Appellants appealed from the judgment. While their appeal was pending, we requested that the parties submit supplemental briefs addressing whether this court has appellate jurisdiction in light of the fact that the appellants dismissed several non-CEQA causes of action *without* prejudice prior to the trial court's entry of judgment on the CEQA claim. Upon consideration of the parties' supplemental briefs and further review of the issue, we conclude that a party may appeal from a judgment rendered on a particular claim in a case, notwithstanding that certain other claims have been dismissed *without* prejudice, as long as there are no remaining claims pending between the parties and the parties have not entered into a stipulation that would facilitate potential future litigation of the dismissed claims. Since there are no such remaining claims and there is no such stipulation in this case, we conclude that we have appellate jurisdiction over appellants' appeal.

On the merits, appellants claim that the trial court erred in denying their CEQA claim. Appellants maintain that this court should "reject *Benton*," a decision that they contend is "fatally flawed," and hold that the District erred in relying on section 21166 and Guidelines section 15162 in determining whether preparation of an EIR was required in connection with the adoption of the 2008 EDP Regulations. Appellants also argue that there is substantial evidence to support a "fair argument" that the 2008 EDP Regulations would

---

[3] The non-CEQA claims are not before us in this appeal. (See pt. III.A., *post*.)

have a significant effect on the environment, and that preparation of an EIR is thus required. In the alternative, appellants contend that even if section 21166 applies, because the regulations substantially increased the priority preference that industrial users of water would receive over agricultural users in times of a water shortage, the District was required to prepare an EIR prior to adopting the 2008 EDP Regulations. Appellants further maintain that there was a substantial change in the circumstances under which the EDP would be implemented, namely that the District had just approved a water supply contract with the owner of a new powerplant that would be a significant new industrial user of water.

We conclude that the *Benton* court correctly determined that Guidelines section 15162 is a valid regulation that implements the principles contained in section 21166.[4] We further conclude that there is substantial evidence to support the District's determination that it was not required to prepare an EIR prior to adopting the 2008 EDP Regulations. Specifically, we conclude that, contrary to appellants' claim, the 2008 EDP Regulations did not in fact increase the priority preference that industrial users would receive over agricultural users in case of a water shortage. We further conclude that there is substantial evidence to support the District's implicit determination that its approval of a water supply contract with the owner of a new powerplant did not constitute a substantial change in the circumstances under which the EDP was being implemented.

Accordingly, we affirm the judgment denying appellants' petition for writ of mandate on appellants' CEQA claim.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The 2006 EDP Resolution and the 2006 Negative Declaration*

In November 2006, the District adopted a resolution related to the Equitable Distribution Plan. The 2006 EDP Resolution explained the background of the EDP, in part, as follows:

"WHEREAS the District is required by State law to adopt rules and regulations for the equitable distribution of water within the District.

---

[4] In light of this holding, we need not consider appellants' contention that the record contains evidence demonstrating that there is a fair argument that the 2008 EDP Regulations may have a significant impact on the environment.

"WHEREAS the [District] Board desires to develop and implement a plan for the equitable apportionment of water in the event that in any year, the expected demand for water is likely to exceed the supply expected to be available to the District (referred to herein as a supply/demand imbalance or 'SDI' condition)."

With respect to compliance with CEQA, the 2006 EDP Resolution provided in relevant part:

"[B]e it hereby resolved as follows:

"1. The [District] Board has determined that an apportionment plan applicable during an SDI condition should be adopted, in order to satisfy the District's obligation under the California Water Code to provide for the equitable distribution of water within the District.

"2. In order to comply with CEQA:

"a. The Board has reviewed the Initial Study relating to the proposed Equitable Distribution Plan and the Draft Negative Declaration, which indicates that the Plan will not have significant effect on the environment.

"b. The Board has reviewed and considered the comments received on the Draft Negative Declaration.

"c. The Board has reviewed and considered the Final Negative Declaration attached to this Resolution as Attachment A.

"d. The Board finds that: (i) the Final Negative Declaration provides sufficient assessment of the environmental impacts of the proposed Equitable Distribution Plan pursuant to CEQA; (ii) although the Final Negative Declaration incorporates changes to the Draft Negative Declaration, none of those changes constitutes 'substantial revision' requiring recirculation pursuant to the criteria set forth in CEQA Guidelines Section 15073.5; (iii) the Final Negative Declaration reflects the Board's independent judgment and analysis; and (iv) on the basis of the whole record (a copy of which shall be maintained by the General Manager) there is no substantial evidence that the proposed Equitable Distribution Plan will have significant effect on the environment.

"e. The Board hereby approves and adopts the Final Negative Declaration."

The 2006 EDP Resolution described the Equitable Distribution Plan as follows:

"The [District] Board hereby approves the development and implementation of the Equitable Distribution Plan, including the following elements:

"a. Water shall be apportioned among agricultural users using the straight-line method of allocation, based upon the ease of implementation and efficiency of this method.

"b. Transfer of the right to use such apportionments among agricultural users shall be permitted, subject to reasonable terms and conditions.[5]

"The [District] Board hereby directs the General Manager to prepare the rules and regulations necessary or appropriate to implement the Equitable Distribution Plan within the District. The General Manager is authorized to finalize the Equitable Distribution Plan, so that water users will be made aware of, and be able to rely upon, the rules and regulations which will be used in the future when an SDI occurs. Finally, the General Manager is authorized to implement the Plan in the event of an SDI condition."

The 2006 Negative Declaration described the Project, in relevant part, as follows: "Under the proposed Equitable Distribution Plan, during, or not later than, October of each year, [the District's] staff will forecast water demand and available supply for the following year and make a recommendation regarding the risk of water user demands exceeding available supply for the following calendar year. If the staff analysis concludes that forecasted water user demands will exceed the annual supply, then a Supply Demand Imbalance (SDI) will be recommended. Declaration of an SDI situation requires implementation of allocation of water pursuant to the Equitable Distribution Plan for the following year. If demand is not predicted to exceed supply, then Equitable Distribution is not needed for the following year. The SDI determination can be revisited at any time during the year to determine if Equitable Distribution should continue or be suspended for the remaining months of the year."

The 2006 Negative Declaration described the manner by which apportionment among different types of water users would be conducted under the EDP:

"In the [District] water service area, agricultural lands cultivating vegetables and field crops currently account for about 90% of the water use.

---

[5] The "straight-line" method of allocation and the transfer of such allocations pertains to the distribution of water *among* agricultural users. Appellants state in their brief that these components of the EDP are not "at issue in this litigation," which centers around the priority afforded to industrial users *over* agricultural users in the distribution of water in the case of a shortage.

Permanent crops account for an additional 6%. The remaining 4% is divided between municipal, industrial and miscellaneous uses. The Equitable Distribution Plan acknowledges that some groups may warrant lesser cutbacks than others. For some users, such as industrial users, permanent crops and dairies, a cutback in water deliveries has the potential to result in greater economic harm compared to other users. In addition, cutbacks to some user types such as municipal users which account for only 3% of the total current water demand, may be costly to implement, but provide only very minor contribution to reducing the overall water demand. In the event of an SDI, the proposed Equitable Distribution Plan would allocate the available water supply to water user accounts based on the following water use categories:

"• System Losses—Annual Estimated Loss in AF [(acre-feet)[6]]

"• Supply of Last Resort—Set Amount or percentage of total supply in AF

"• Municipal Users—AF per Capita

"• Industrial Users—Contracted Amount in AF

"• Feed Lots—AF per animal

"• Permanent Crops—Acre Feet based on Crop Needs

"• Agricultural Lands per Acre—Straight Line Apportionment: Remaining Supply divided by authorized total acres."

The 2006 Negative Declaration also explained that industrial users enter into contracts with the District to receive a specified amount of water from the District, and that such users would continue to receive the contractually specified amounts of water from the District in the case of a supply/demand imbalance declaration and implementation of the EDP: "Industrial users within the [District] water service area include geothermal facilities, food processing facilities, manufacturing plants etc. These users hold existing contracts within [the District] to receive a specified amount of water that is based on the requirements specific to their industry and are based on reasonable use. In the event of an SDI to avoid significant economic harm to these industries the Equitable Distribution Plan includes continuing to provide these users with the contracted amount in acre feet."

B.  *The 2007 EDP Regulations*

In December 2007, the District adopted regulations implementing the EDP, as required by the 2006 EDP Resolution. The 2007 EDP Regulations

---

[6] One acre-foot is equivalent to approximately 325,851 gallons.

provided the manner by which apportionment would be conducted under the EDP in the event of the declaration of a supply/demand imbalance among different types of water users, as follows:

"Apportionment of Supply. Upon SDI Declaration, District shall apportion the estimated supply among the types of water users in the District using the following criteria:

"a. Supply of Last Resort will be two percent 2% of Available Water Supply;

"b. Municipal Users—Base amount of 2006 usage plus District-wide average per capita use multiplied by the increase in population since 2006;

"c. Industrial Users—Estimated based on past use not to exceed contracted amount;

"d. Feed Lots, Dairies, and Fish Farms—Estimated based upon past use;

"e. Environmental Resources Water—Estimated based upon the amount reasonably necessary to achieve the purposes of the District's commitments taking past use into account; and

"f. Agricultural Lands—Subtract the estimated demand for categories a through e above from Available Water Supply, then divide the remaining supply by the total number of Eligible Agricultural Acres to determine the apportionment per Eligible Agricultural Acre."

Concurrently with the adoption of the 2007 EDP Regulations, the District adopted an "Environmental Compliance Report" that concluded as follows: "Minor modifications to the Plan as anticipated in the [2006] Negative Declaration have been incorporated in the [EDP] Regulations; however, the District has determined that these modifications do not result in environmental effects which would trigger the preparation of an additional environmental assessment pursuant to CEQA Guidelines, Section 15162."

C. *The 2008 EDP Regulations*

In November 2008, the District adopted revised regulations implementing the EDP. Like the 2007 EDP Regulations, the 2008 EDP Regulations provided the manner by which apportionment would be conducted under the EDP in the event of the declaration of a supply/demand imbalance among types of water users. The 2008 EDP Regulations provided:

"Apportionment of Supply. Upon SDI Declaration, District shall apportion the Available Water Supply among the types of water users in the District using the following criteria:

"a. Municipal Users—Base amount of 2006 usage plus current District-wide average use per capita multiplied by the increase in population since 2006;

"b. Industrial Users—For existing contracts, estimated based on past use, not to exceed contracted amount and contract terms. For new contracts, estimated based on anticipated use, not to exceed contract amount and contract terms, taking into consideration the Integrated Water Resources Management Plan;[7]

"c. Feed Lots and Dairies—Estimated based upon past use and consideration of future changes;

"d. Environmental Resources Water—Estimated based upon the amount reasonably necessary to achieve the purposes of the District's commitments, taking past use into account; and

"e. Agricultural Lands—Straight Line Apportionment used. Subtract the estimated demand for categories a through e from Available Water Supply, and then divide the remaining supply by the total number of Eligible Agricultural Acres pursuant to Subsections 2.10 a through d above to determine the apportionment per Eligible Agricultural Acre. The amount apportioned to acreage that does not comply with Subsection 2.10 d will be placed in the District Water Exchange."

Concurrently with the adoption of the 2008 EDP Regulations, the District adopted an "Environmental Compliance Report," that again concluded that no additional environmental review was warranted pursuant to CEQA and Guidelines section 15162.

D.  *Appellants' petition*

In September 2009, appellants filed a second amended verified petition for writ of mandate/complaint requesting that the trial court set aside the 2008 EDP regulations "until such time as CEQA review has been completed and that meaningful analysis of the impacts and alternatives may occur." The trial court held a hearing on appellants' CEQA claim, took the matter under

---

[7] See footnote 21, *post*, for a discussion of the "Integrated Water Resources Management Plan."

submission, and entered an order denying the claim. In its order, the court applied *Benton, supra,* 226 Cal.App.3d 1467, and section 21166, and held that there was substantial evidence to support the District's determination that the adoption of the 2008 EDP Regulations did not require the preparation of an EIR. In reaching this conclusion, the trial court found that "the '[P]roject' as it existed in 2008, included the [2007 EDP Regulations]." The trial court further found that there was substantial evidence to support the District's determination that there had been no changes in the Project or in the surrounding circumstances since the adoption of the 2007 EDP Regulations that warranted additional environmental review under section 21166. The court reasoned in part:

"[Appellants] contend that the [2008 EDP Regulations] afford 'new' industrial users a 'virtually unlimited supply of water.' [Citation.] However, [appellants] do not address the meaning of 'new' as it relates to the regulation.

"The [2007 EDP Regulations] provided that industrial users received water limited to the amount of their contract *or* based on past use, whichever was *less*. The regulation did not differentiate between 'new' and 'existing' industrial users. No provision was made for limiting water to below contract amounts if there was no history of past use. The [2008 EDP Regulations] corrected this omission by providing that 'new' contracts would receive water based on 'anticipated' use, or the contract amount, whichever was less. Thus, it is clear that a 'new' contract is a contract without a history sufficient to allow [the District] to deliver less than the contract amount. It is also clear that the [2008 EDP Regulations] were a *limitation* on the water that would be delivered to 'new' contracts, not an expansion as asserted by [appellants].

"When the true nature of the [2008 EDP Regulations] are [*sic*] thus viewed, it is clear from the record that they did not constitute[] a substantial change to the [P]roject under section 21166[, subdivision] (a). Further it cannot be seriously argued that allowing [the District] to *limit* water delivery to 'new' industrial contracts was a substantial change requiring revisions of the negative declaration under section 21166[, subdivision] (b). Finally, although new information may have been available at the time of the 2008 amendments, that new information related in no way to the amendment being approved—the clarification that [the District] could limit new industrial contracts to *less* than the contract amount if appropriate.

"The record here demonstrates that [the District's] determination that the [2008 EDP Regulations] required no further environmental review is supported by substantial evidence."

After the trial court entered its order, appellants dismissed several additional causes of action contained in their petition, without prejudice.[8] The trial court thereafter entered a judgment on appellants' CEQA claim in accordance with its order and the parties' stipulation for entry of judgment. Appellants appeal from the judgment.

## III.

## DISCUSSION

### A. *Appellate jurisdiction*

We consider whether we have appellate jurisdiction over this appeal, in view of the fact that appellants dismissed several causes of action *without* prejudice prior to entry of the judgment from which they appeal.

#### 1. *Governing law*

■ The one final judgment rule, codified in Code of Civil Procedure section 904.1, subdivision (a)(1), states that an appeal in a civil case "may be taken from . . . [¶] . . . a judgment, except . . . an interlocutory judgment," and from other specific trial court rulings not relevant here. "Judgments that leave nothing to be decided between one or more parties and their adversaries, or that can be amended to encompass all controverted issues, have the finality required by [Code of Civil Procedure] section 904.1, subdivision (a). A judgment that disposes of *fewer* than all of the causes of action framed by the pleadings, however, is necessarily 'interlocutory' [citation], and not yet final, as to any parties between whom another cause of action remains pending." (*Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 741 [29 Cal.Rptr.2d 804, 872 P.2d 143] (*Morehart*).) "[A]n appeal cannot be taken from a judgment that fails to complete the disposition of all the causes of action between the parties . . . ." (*Id.* at p. 743.)

Several courts have held that an appeal cannot be taken from a stipulated judgment that disposes of some of the causes of action between the parties when the parties have dismissed the remaining claims between them without prejudice and entered into a stipulation facilitating potential future litigation of the dismissed claims. (See, e.g., *Hoveida v. Scripps Health* (2005) 125 Cal.App.4th 1466 [23 Cal.Rptr.3d 667] (*Hoveida*); *Hill v. City of Clovis* (1998) 63 Cal.App.4th 434 [73 Cal.Rptr.2d 638] (*Hill*); *Four Point Entertainment, Inc. v. New World Entertainment, Ltd.* (1997) 60 Cal.App.4th 79 [70

---

[8] The dismissed claims challenged the District's authority to issue the 2008 EDP Regulations pursuant to Water Code section 22252, and various alleged trust obligations.

Cal.Rptr.2d 82] (*Four Point*); *Jackson v. Wells Fargo Bank* (1997) 54 Cal.App.4th 240 [62 Cal.Rptr.2d 679] (*Jackson*); *Don Jose's Restaurant, Inc. v. Truck Ins. Exchange* (1997) 53 Cal.App.4th 115 [61 Cal.Rptr.2d 370] (*Don Jose's Restaurant*).)

In *Don Jose's Restaurant*, after the trial court granted the defendants' motion for summary adjudication as to two of the plaintiffs' 11 causes of action, the parties entered into "a formal written stipulation in which the plaintiffs agreed to dismiss all their remaining causes of action, *but* without prejudice and *with* a waiver of all applicable statutes of limitation." (*Don Jose's Restaurant, supra*, 53 Cal.App.4th at p. 117.) The parties further agreed "that in the event the plaintiffs' appeal from the trial court's 'order regarding [the] motion for summary adjudication' was successful and the matter was remanded, the action would proceed on all the causes of action set forth in the latest complaint," while if the appellate court affirmed, the plaintiffs would dismiss their remaining claims with prejudice. (*Ibid.*) The *Don Jose's Restaurant* court "condemn[ed] the artifice of trying to create an appealable order from an otherwise nonappealable grant of summary adjudication by dismissing the remaining causes of action without prejudice but with a waiver of applicable time bars" (*id.* at p. 116), reasoning: "[T]he one final judgment rule does not allow contingent causes of action to exist in a kind of appellate netherworld. The substance of this case is that there was a disposition of only two of eleven causes of action, with the remaining causes of action left for trial. It makes no difference that this state of affairs is the product of a stipulation, or even of encouragement by the trial court. Parties cannot create by stipulation appellate jurisdiction where none otherwise exists." (*Don Jose's Restaurant, supra*, 53 Cal.App.4th at pp. 118–119, fn. omitted.)

In *Hoveida, supra*, 125 Cal.App.4th at page 1467, the trial court granted the defendants' motion for summary adjudication of all but one of the plaintiff's causes of action. The plaintiff then dismissed without prejudice his remaining breach of contract claim and entered into a stipulation with the defendants that permitted him to "maintain his breach of contract cause of action if the appeal is successful, but not if it is unsuccessful." (*Id.* at p. 1468.) The trial court proceeded to enter a judgment pursuant to the parties' stipulation, and the plaintiff appealed. (*Ibid.*) On appeal, applying *Don Jose's Restaurant*, this court dismissed the appeal from the stipulated judgment for lack of appellate jurisdiction. (*Hoveida, supra*, at p. 1468 [" 'Parties cannot create by stipulation appellate jurisdiction where none otherwise exists' " (quoting *Don Jose's Restaurant, supra*, 53 Cal.App.4th at pp. 118–119)]; see *Hill, supra*, 63 Cal.App.4th at pp. 436, 441–442 [concluding Court of Appeal lacks jurisdiction to consider appeal from stipulated judgment where parties entered into a stipulation that provided for dismissal of remaining causes of action without prejudice and contained provision

waiving all applicable statutes of limitations as to dismissed claims]; *Jackson, supra,* 54 Cal.App.4th at pp. 242–243 [same]; *Four Point, supra,* 60 Cal.App.4th at p. 82, fn. 2 [same].)

In *Kurwa v. Kislinger* (2012) 204 Cal.App.4th 21 [138 Cal.Rptr.3d 610] (*Kurwa*), the trial court dismissed all but one of the plaintiff's causes of action *with* prejudice and dismissed *without* prejudice the plaintiff's remaining claim for defamation and the defendants' cross-claim for defamation, in light of a stipulation in which all parties agreed to "waive the applicable statute of limitations," as to the defamation claims. (*Id.* at p. 27.) On appeal, the defendants contended that "the dismissal without prejudice of the parties' defamation causes of action, coupled with a waiver of the statute of limitations, renders the judgment interlocutory, as it leaves open the possibility that the parties may litigate those claims in the future." (*Ibid.*) The *Kurwa* majority rejected this argument and concluded that the fact that other claims had been dismissed *without* prejudice and that the parties had agreed to waive the applicable statute of limitations did not prevent the court from exercising its appellate jurisdiction, reasoning:

"We acknowledge that a line of appellate opinions, beginning with *Don Jose's Restaurant*[, *supra,*] 53 Cal.App.4th 115 . . . reaches a different conclusion on similar facts. (See [*Jackson, supra,*] 54 Cal.App.4th 240] . . . ; *Four Point*[, *supra,*] 60 Cal.App.4th 79; *Hill*[, *supra,*] 63 Cal.App.4th 434 . . . ; *Hoveida*[, *supra,*] 125 Cal.App.4th 1466 . . . .) These cases hold that a cause of action dismissed without prejudice remains 'pending' within the meaning of *Morehart*. [*Don Jose's Restaurant*] characterized the dismissed causes of action as existing 'in a kind of appellate netherworld' (*Don Jose's Restaurant*[, *supra,*] 53 Cal.App.4th at p. 118), while [*Hill*] described them as 'undecided and legally alive.' ([*Hill, supra,*] 63 Cal.App.4th at p. 445.) Accordingly, these cases hold that a judgment entered following a dismissal without prejudice is not final, and the orders of the trial court subsumed in the interlocutory judgment are not appealable unless and until the dismissed causes of action are subsequently revived and adjudicated on the merits. (*Id.* at p. 446.)

"We interpret the term 'pending' more narrowly. In our view, a cause of action is pending when it is filed but not yet adjudicated. Such was the case in *Morehart, supra,* 7 Cal.4th 725. The Supreme Court there held that the judgment was not final because the trial court which entered it continued to have jurisdiction over additional causes of action pending before it. While a cause of action which has been dismissed may be pending 'in the appellate netherworld,' it is not pending in the trial court, or in any other court, and thus cannot fairly be described as 'legally alive.' We conclude that, because no causes of action remained to be tried in the court which entered judgment

in favor of [the defendant], and indeed that court had no jurisdiction to do anything except enter judgment, the judgment entered is final."[9] (*Kurwa, supra*, 204 Cal.App.4th at pp. 29–30.)

### 2. *Application*

■ For the reasons set forth below, we conclude that claims that are dismissed without prejudice are no less final for purposes of the one final judgment rule than are adjudicated claims, *unless*, as in *Don Jose's Restaurant* and its progeny, there is a stipulation between the parties that facilitates potential future litigation of the dismissed claims.

Although the *Kurwa* court broadly stated that the courts in the *Don Jose's Restaurant* line of cases "h[e]ld that a judgment entered following a dismissal without prejudice is not final" (*Kurwa, supra*, 204 Cal.App.4th at p. 29), in fact, these cases were decided on a narrower basis.[10] As discussed above, *Don Jose's Restaurant* and its progeny all involved stipulations between the parties that were designed to "create . . . appellate jurisdiction," and that permitted "contingent causes of action" to "exist in a kind of appellate netherworld." (*Don Jose's Restaurant, supra*, 53 Cal.App.4th at p. 118.)[11] However, absent such a stipulation, causes of action that have been dismissed without prejudice do *not* exist as contingent claims in *any* court and cannot "fairly be described as 'legally alive.' " (*Kurwa, supra*, at p. 30.)

The *Hill* court relied on the distinction between claims that have been voluntarily dismissed *without* a stipulation and claims that have been voluntarily dismissed *pursuant* to a stipulation in holding that the latter results in a "stipulated 'judgment' " that "keeps these causes of action undecided and legally alive for future resolution in the trial court." (*Hill, supra*, 63 Cal.App.4th at p. 445.) The *Hill* court reasoned that the dismissal of claims

---

[9] A dissenting justice in *Kurwa* concluded that the appeal should be dismissed, reasoning, "The dismissal without prejudice and waiver of the statute of limitations on the cause of action for defamation leads to the inescapable conclusion the judgment did not dispose of the entirety of the action." (*Kurwa, supra*, 204 Cal.App.4th at p. 34 (dis. opn. of Kriegler, J.) [citing *Don Jose's Restaurant* and its progeny].)

[10] The *Kurwa* majority did not discuss the nature of the stipulated judgment at issue in *Don Jose's Restaurant* and its progeny.

[11] We have found one case, *Areso v. CarMax, Inc.* (2011) 195 Cal.App.4th 996, 1001 [124 Cal.Rptr.3d 785] (*Areso*), that appears to hold that a judgment is not final for purposes of the one final judgment rule if any of the causes of action pled in the complaint have been dismissed without prejudice. The *Areso* court did not discuss *Don Jose's Restaurant* or its progeny, and instead, appears to have reached this holding based on case law addressing the distinct question of whether a party may appeal the dismissed claim itself. (See *Areso, supra*, at p. 1001 ["Generally, a voluntary dismissal without prejudice is not a final judgment appealable on the merits." (citing *Syufy Enterprises v. City of Oakland* (2002) 104 Cal.App.4th 869, 879 [128 Cal.Rptr.2d 808])].) Accordingly, we do not find *Areso* persuasive on this point.

entered pursuant to a stipulation to facilitate the potential future litigation of the dismissed claims requires judicial action, and improperly attempts to vest jurisdiction in a reviewing court: "Appellants have not persuaded us to hear the case in its present posture. The fact that [the cross-complainant] may have a statutory right to dismiss a cause of action without prejudice is not determinative of our appellate jurisdiction. The dismissal here was not the result of a unilateral act by the [cross-complainant]. '[T]he court, not the parties, dismissed the unresolved claims based upon a stipulation that is unenforceable because it purports to vest jurisdiction in an appellate court where none exists.' [Citation.]" (*Ibid.*)

The *Hill* court contrasted this type of stipulated dismissal with a party's voluntary dismissal *without* such a stipulation, as in the present case, as follows: "Moreover, a party's voluntary dismissal without prejudice does not come equipped by law with an automatic tolling or waiver of all relevant limitations periods; instead, such a dismissal includes the very real risk that an applicable statute of limitations will run before the party is in a position to renew the dismissed cause of action. Also, a voluntary dismissal does not protect a cross-complainant from a later contention that a dismissed cause of action in a cross-complaint was compulsory and therefore required to be brought and adjudicated in the action initiated by the plaintiff. [Citations.] Instead, such a dismissal raises the possibility that the judgment in the action, if affirmed on appeal, will activate the statutory bar against any subsequent attempt by the cross-complainant to reinitiate prosecution of the dismissed cause of action." (*Hill, supra,* 63 Cal.App.4th at p. 445.)

In this case, it is undisputed that appellants dismissed their remaining causes of action without any waiver of the applicable statute of limitations as to the dismissed claims, and without any stipulation that would facilitate the potential future litigation of the dismissed claims. The District acknowledges in its supplemental brief that in this respect, this case "differs factually" from the *Don Jose's Restaurant* line of cases.

We find this distinction dispositive. In the absence of such a stipulation and a resulting stipulated judgment, as existed in the *Don Jose's Restaurant* line of cases, a judgment does not lack finality merely because some causes of action have previously been disposed of by way of a dismissal without prejudice. Simply put, claims that have been dismissed, whether with or without prejudice, are not "pending" (*Morehart, supra,* 7 Cal.4th at p. 741) for purposes of the one final judgment rule.

To conclude otherwise could potentially lead to the highly undesirable consequence of making it difficult to determine the date from which a party must take an appeal. If claims that have been dismissed without prejudice are

deemed to remain pending for purposes of the one final judgment rule, absent modification of the rules governing appealability, an appellant would have the power to delay indefinitely the date on which an appealable final judgment is entered by simply delaying the dismissal *with* prejudice of claims that have already been dismissed *without* prejudice. Determining a precise and easily ascertainable date for the running of the appeal period was the primary concern that led the Supreme Court to reject the exception to the one final judgment rule at issue in *Morehart*. (*Morehart, supra,* 7 Cal.4th at pp. 742–744.)

The District contends that the existence of a stipulation that would facilitate potential future litigation of dismissed claims between the parties should not be dispositive because the potential for "piecemeal and successive appeals in a single action," for which the one final judgment rule is designed to prevent (see *Morehart, supra,* 7 Cal.4th at p. 741, fn. 9), arises regardless of whether or not there is such a stipulation. The District reasons that there is potential for piecemeal appeals "whenever un-adjudicated claims are dismissed without prejudice in order to ripen an appeal of a judgment that adjudicates other claims in a complaint, *whether or not* the dismissal is accompanied by a limitations or tolling agreement," and that "[a]ll the limitations waiver or tolling agreement adds is *assurance* to the appellant who has adopted this strategy that, if the remaining time to sue on—and thereby reactivate—the un-adjudicated claims is short, it will not expire while the appeal is pending." (Italics added.)

Even assuming that the District is correct as to the theoretical possibility of future litigation of claims that have been dismissed without prejudice if a reviewing court remands the matter, it is the "*assurance*" (italics added) of the potential for future litigation that animated the *Don Jose's Restaurant* bar against manufacturing appellate jurisdiction by way of a stipulated judgment. (See *Don Jose's Restaurant, supra,* 53 Cal.App.4th at p. 118 ["The stipulation here virtually exudes an intention to retain the remaining causes of action for trial."].) In our view, the theoretical possibility of future litigation of claims that have been dismissed without prejudice and without a stipulation does not render a judgment any less final than does the possibility of litigation of claims that may be asserted in the first instance on remand.

█ We conclude that claims that have been dismissed, *with or without prejudice*, do not remaining "pending" within the meaning of *Morehart, supra,* 7 Cal.4th at page 741, *unless* there is a stipulation between the parties facilitating future litigation of the dismissed claims. However, where such a stipulation does exist, the resulting stipulated judgment lacks sufficient finality to be appealable pursuant to the one final judgment rule.

B. *The trial court properly denied appellants' CEQA claim*

1. *Guidelines section 15162 is a valid regulation that implements Public Resources Code section 21166*

Appellants contend that Guidelines section 15162 is invalid because it improperly "purport[s] to extend section 21166 to negative declarations." Based on this contention, appellants argue that the District erred in relying on section 21166 and Guidelines section 15162 in determining whether preparation of an EIR was required in connection with the adoption of the 2008 EDP Regulations. Appellants contend that instead of determining whether the circumstances specified in Guidelines section 15162 and Public Resources Code section 21166 that would permit additional environmental review had occurred, the District was required to apply the "fair argument" standard in determining whether an EIR was required. Because appellants' claim raises a pure question of law, we apply the de novo standard of review. (See *Lincoln Place Tenants Assn. v. City of Los Angeles* (2005) 130 Cal.App.4th 1491, 1503 [31 Cal.Rptr.3d 353] [stating that questions of law in case arising under CEQA are reviewed de novo].)

a. *Guidelines section 15162*

Guidelines section 15162 specifies that after an agency has certified an EIR or a negative declaration, no subsequent EIR shall be prepared unless certain circumstances occur. The regulation provides in relevant part:

"(a) When an EIR has been certified or a negative declaration adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following:

"(1) Substantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

"(2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

"(3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the

time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:

"(A) The project will have one or more significant effects not discussed in the previous EIR or negative declaration . . . ."

### b. *Section 21166*

Guidelines section 15162 implements the principles contained in Public Resources Code section 21166, which also describes the circumstances under which an agency may require the preparation of a subsequent or supplemental EIR. Section 21166 provides:

"When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:

"(a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report.

"(b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report.

"(c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

### c. *Benton v. Board of Supervisors*

In *Benton, supra,* 226 Cal.App.3d at page 1473, a company filed an application for a use permit to construct a winery. The County of Napa (County) issued the permit and a mitigated negative declaration[12] related to the winery project. (226 Cal.App.3d at p. 1473.) Approximately eight months later, the company applied for a second use permit to build the winery on a site adjacent to the site that was originally contemplated. (*Ibid.*) After evaluating "the environmental impact of the project based on the difference between the original winery and the relocated one," the County adopted another mitigated negative declaration. (*Ibid.*) Several persons who were opposed to the project filed a petition for writ of mandamus in the trial court,

---

[12] A "mitigated" negative declaration is a negative declaration that includes "mitigation measures to avoid potentially significant environmental effects." (*Benton, supra,* 226 Cal.App.3d at p. 1472, fn. 1.)

contending that CEQA precluded the issuance of the second use permit without the preparation of an EIR. (226 Cal.App.3d at p. 1473.) The trial court denied the petition. (*Id.* at p. 1474.)

On appeal, the petitioners argued that the County could not lawfully apply Guidelines section 15162 in determining whether the preparation of an EIR was required in connection with the company's second application. (*Benton, supra,* 226 Cal.App.3d at p. 1477.) The petitioners argued that Guidelines section 15162 was void to the extent it purported to extend the limitation on subsequent environmental review embodied in Public Resources Code section 21166 to cases in which an agency's initial environmental determination resulted in the issuance of a negative declaration rather than an EIR, because the text of section 21166 refers only to EIR's. (*Benton, supra,* at pp. 1477–1478.) The *Benton* court rejected this contention, concluding, "Our reading of [Guidelines section] 15162 and section 21166 convinces us that the rule does not exceed its statutory authority." (*Benton, supra,* at p. 1479.) The *Benton* court reasoned in part: "The negative declaration provisions of [Guidelines section] 15162 satisfy the same purpose as the portions of [Guidelines section] 15162—and section 21166, its enabling statute—that apply to EIR's. In a case in which an initial EIR has been certified, section 21166 comes into play precisely because in-depth review of the project has already occurred, the time for challenging the sufficiency of the original CEQA document has long since expired, and the question before the agency is whether circumstances have changed enough to justify repeating a substantial portion of the process. [Citations.] These same principles apply with even greater force in a case such as this, in which the initial environmental review resulted in the issuance of a negative declaration, rather than an EIR. If a limited review of a modified project is proper when the initial environmental document was an EIR, it stands to reason that no greater review should be required of a project that initially raised so few environmental questions that an EIR was *not* required, but a negative declaration was found to satisfy the environmental review requirements of CEQA. To interpret CEQA as requiring a greater level of review for a modification of a project on which a negative declaration has been adopted and a lesser degree of review of a modified project on which an EIR was initially required would be absurd." (*Id.* at pp. 1479–1480.)

The *Benton* court also specifically rejected the petitioners' argument that Guidelines section 15162 was invalid because the text of Public Resources section 21166 refers only to EIR's, and makes no mention of negative declarations. The *Benton* court instead concluded that applying Guidelines section 15162 in cases in which the initial environmental review resulted in a negative declaration is consistent with, and furthers the policies underlying, CEQA, reasoning in part:

■ "When construing a regulation, a court may look to the general principles and policies underlying the statutory scheme, as well as to the language of the statute itself. [Citation.] Applying [Guidelines section] 15162 in cases in which the initial environmental review resulted in a negative declaration furthers CEQA goals. For example, it is the Legislature's declared policy that public comments on the environmental review of projects shall be made to the agency as soon as possible in the review of EIR's—including negative declarations—in order to allow the agency to identify, at the earliest possible time in the environmental review process, potential significant effects of a project, alternatives, and mitigation measures which would substantially reduce the effects. [Citation.] [Guidelines section] 15162 furthers the Legislature's stated policy by encouraging the environmental review of a project at the earliest possible time, rather than requiring review of the entire project again when modifications to it must be approved by local planning bodies.

". . . [A] regulation that fulfills the purpose of the law is not an addition to the underlying statute. [Citations.] Having considered this matter carefully, we are satisfied that [Guidelines section] 15162 promotes the purposes of section 21166, rather than violating the intent of the statute. [Citation.]" (*Benton, supra,* 226 Cal.App.3d at pp. 1480–1481.)

> d. *The* Benton *court correctly concluded that Guidelines section 15162 validly implements the principles contained in Public Resources Code section 21166*

Appellants raise several arguments in support of their contention that *Benton* is a "mistaken decision" that we should reject. We consider and reject each of appellants' arguments and conclude that the *Benton* court properly determined that Guidelines section 15162 is a valid regulation.[13]

■ Appellants' principal contention is that Guidelines section 15162 is invalid because it improperly "attempts to extend section 21166 to negative

---

[13] In their reply brief, appellants contend that "it is not even clear whether they [(the Guidelines)] are regulations or 'merely aids to interpreting CEQA.' [Citation.]" On the contrary, it is clear that the Guidelines are regulations. (E.g., *Communities for a Better Environment v. South Coast Air Quality Management Dist., supra,* 48 Cal.4th at p. 319, fn. 4 ["The *regulations* guiding application of CEQA . . . are often . . . referred to as the CEQA Guidelines" (italics added)]; accord Guidelines, § 15000 ["*The regulations* contained in this chapter are prescribed by the Secretary for Resources to be followed by all state and local agencies in California in the implementation of the California Environmental Quality Act." (italics added)].) While the Supreme Court " 'has not decided the issue of whether the Guidelines are regulatory mandates or only aids to interpreting CEQA,' [the Supreme Court] ha[s] observed that, '[a]t a minimum, . . . courts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA.' " (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 48, fn. 12 [105 Cal.Rptr.3d 181, 224 P.3d 920].)

declarations where the statutory text limits its application to environmental impact reports." This is the precise contention that the *Benton* court squarely and in our view, persuasively, rejected. We agree with the *Benton* court's conclusion that Guidelines section 15162 is valid because it furthers the purposes of Public Resources Code section 21166, notwithstanding that the text of section 21166 refers only to EIR's. In addition to the persuasive reasons that the *Benton* court offered, we observe that Guidelines section 15162 was adopted pursuant to Public Resources Code section 21083. (See, e.g., *Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 525, fn. 4 [98 Cal.Rptr.2d 334] [noting that all Guidelines are "certified and adopted by the Secretary of the California Resources Agency pursuant to Public Resources Code section 21083"].) Section 21083 mandates that the Guidelines, "include objectives and criteria for . . . the preparation of environmental impact reports and negative declarations *in a manner consistent with this division.*"[14] (§ 21083, subd. (a), italics added.) For the reasons stated by the *Benton* court, we agree that Guidelines section 15162 is "consistent with" Public Resources Code section 21166. (§ 21083.)[15]

Appellants maintain that "the reasoning of the *Benton* court is fatally flawed." In support of this argument, appellants contend that the limitation on further environmental review contained in section 21166 is premised on the fact that a "full review of potential environmental impacts has already been conducted" by way of an EIR. Appellants argue that in contrast, an agency conducts "almost no environmental review whatever" in adopting a negative declaration. Based on this contention, appellants maintain that the limitation on further environmental review contained in section 21166 may not be applied when the agency has initially adopted a negative declaration rather than an EIR.

At the outset, we disagree with appellants' characterization concerning the extent of environmental review that is involved in the adoption of a negative declaration. (See Guidelines, § 15071 [specifying required contents of negative declaration, including the preparation of an "initial study"]; see also

---

[14] Section 21166 is within the same division of the Public Resources Code as section 21083.

[15] We also reject appellants' related argument that the *Benton* court improperly engaged in an analysis of whether Guidelines section 15162 is "logical," rather than examining whether "it is within the terms" of Public Resources Code section 21166. The *Benton* court carefully considered whether Guidelines section 15162 is consistent with the purpose of section 21166, and specifically determined that it is. This was the proper analysis for the court to undertake in determining whether Guidelines section 15162 was validly promulgated pursuant to Public Resources Code section 21083.

Guidelines, § 15063, subd. (f) [outlining contents of an initial study].)[16] Further, to the extent that a party believes that a negative declaration is insufficient, the party is free to bring a legal challenge to the agency's adoption of such a declaration. (See, e.g., *Communities for a Better Environment v. South Coast Air Quality Management Dist., supra*, 48 Cal.4th at p. 319 ["An agency that, relying on a standard inconsistent with CEQA and the CEQA Guidelines, prepares only a negative declaration has not proceeded in the manner required by law and has thus abused its discretion, calling for a judicial remedy."].) More fundamentally, we agree with the central premise of *Benton* that it makes little sense to set a *lower* threshold for further environmental review of a project that is determined *not* to have a significant effect on the environment than section 21166 sets for a project that *may* have significant effects on the environment. (See *Benton, supra*, 226 Cal.App.3d at p. 1480 ["If a limited review of a modified project is proper when the initial environmental document was an EIR, it stands to reason that no greater review should be required of a project that initially raised so few environmental questions that an EIR was *not* required, but a negative declaration was found to satisfy the environmental review requirements of CEQA."]; see also *ibid.* [calling a contrary contention "absurd"].)[17]

Finally, we reject appellants' contention that *Benton* is an "outlier." Numerous courts have indicated their agreement with the *Benton* court's conclusion that Guidelines section 15162 applies in determining whether further environmental review is warranted where the agency has initially adopted a negative declaration. *In Moss v. County of Humboldt, supra*, 162 Cal.App.4th at page 1049, the court summarized this case law as follows: " 'Although the statute speaks only in terms of the EIR, CEQA Guidelines apply section 21166 to project changes following an agency's adoption of a negative declaration or a mitigated negative declaration as well as an EIR, and this interpretation has been upheld. (Guidelines, § 15162[, subd. (b)]; [*Benton, supra*, 226 Cal.App.3d at pp. 1477–1481].)' (*American Canyon Community United for Responsible Growth v. City of American Canyon* (2006) 145 Cal.App.4th 1062, 1071–1072 [52 Cal.Rptr.3d 312] . . . ; see also *Save Our Neighborhood v. Lishman* (2006) 140 Cal.App.4th 1288, 1295–1301 [45 Cal.Rptr.3d 306] . . . [applying section 21166 to further review of a project

---

[16] For example, in this case, the 2006 Negative Declaration provided a detailed overview of the Project and the accompanying initial study considered the potential environmental impacts of the Project in a standard checklist fashion.

[17] We reject appellants' related contention that this court must invalidate Guidelines section 15162 in light of the statutory preference for resolving all doubts about the necessity for environmental review in favor of such review. That presumption has no applicability after an agency has determined that an EIR is not required. (See *Moss v. County of Humboldt* (2008) 162 Cal.App.4th 1041, 1049–1050 [76 Cal.Rptr.3d 428] ["[A]fter a project has been subjected to environmental review, the statutory presumption flips in favor of the developer and against further review."].)

for which a mitigated negative declaration had previously been adopted].)" (See, e.g., *Snarled Traffic Obstructs Progress v. City and County of San Francisco* (1999) 74 Cal.App.4th 793, 800 [88 Cal.Rptr.2d 455] [applying *Benton* and concluding agency's adoption of negative declaration warranted application of Guidelines § 15162 in determining whether subsequent environmental review was warranted]; *Security Environmental Systems, Inc. v. South Coast Air Quality Management Dist.* (1991) 229 Cal.App.3d 110, 124 [280 Cal.Rptr. 108] [applying *Benton* and stating "the [defendants] having adopted a negative declaration on the project cannot require [plaintiffs] to prepare an EIR . . . unless there is 'new information' which was not known and could not have been known at the time the negative declaration was adopted"].)

In contrast, we are aware of no cases, and appellants cite none, that have disagreed with the *Benton* court's conclusion that Guidelines section 15162 "is valid when applied to cases in which an initial negative declaration was adopted." (*Benton, supra,* 226 Cal.App.3d at p. 1481.)

> e. *The District did not err in applying Guidelines section 15162 and Public Resources Code section 21166 in determining whether preparation of an EIR was required in connection with the adoption of the 2008 EDP Regulations*

In the alternative, appellants contend that to the extent that this court is "disinclined to *reject Benton* expressly," we should distinguish *Benton* and hold that it is "limited to project[s] on which construction is already underway by the time the challenged action occurs, and which has been completed by the time of the judicial challenge." We reject this contention. There is nothing in either Guidelines section 15162 or Public Resources Code section 21166, upon which *Benton* is premised, that suggests such a restriction. Further, there is nothing in the *Benton* court's analysis that suggests that its holding should be limited to projects for which construction is underway. As the District notes, such a limitation would render section 21166 and Guidelines section 15162 inapplicable in a case such as this, in which the project does not contemplate *any* construction. Appellants have not cited any authority that would support such a limitation.

Accordingly, we conclude that the District did not err in relying on section 21166 and Guidelines section 15162 in determining that preparation of an EIR was not required in connection with the adoption of the 2008 EDP Regulations.

2. *There is substantial evidence in the record to support the District's determination that adoption of the 2008 EDP Regulations did not require the preparation of an EIR*

Appellants contend that "[e]ven if . . . section 21166 applies, [the District] was required to prepare an EIR due to the significant changes to the 2008 EDP Regulations."

We review the District's conclusion that the 2008 EDP Regulations did not require the adoption of an EIR to determine whether there is substantial evidence to support it. (E.g., *Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 110 [56 Cal.Rptr.3d 728] [stating that agency's determination concerning whether to prepare EIR under § 21166 is reviewed for substantial evidence].) In reviewing an agency's decision not to require additional environmental review "pursuant to section 21166, courts 'are not reviewing the record to determine whether it demonstrates a possibility of environmental impact, but are viewing it in a light most favorable to the [agency's] decision in order to determine whether substantial evidence supports the decision not to require additional review.' [Citation.]" (*Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1398 [64 Cal.Rptr.3d 79].)

a. *Appellants are precluded from contending that the District violated CEQA in adopting either the 2006 Equitable Distribution Resolution or the 2007 EDP Regulations, and may challenge only whether the District's revision of the 2007 EDP Regulations in the 2008 EDP Regulations warranted additional environmental review*

Appellants concede in their opening brief that they may not challenge either the 2006 Equitable Distribution Resolution or the 2007 EDP Regulations, stating, "[Appellants] understand that they are only entitled to challenge the 2008 final EDP, and that they cannot challenge undesirable elements of the 2006 resolution or the 2007 voluntary pilot resolutions." Appellants are correct, since it is undisputed that there were no legal challenges to either the 2006 Equitable Distribution Resolution or to the 2007 EDP Regulations within the operative limitations periods. (§ 21167.)[18]

---

[18] Section 21167, subdivision (a) contains a 180-day limitation period for actions "alleging that a public agency is carrying out or has approved a project that may have a significant effect on the environment without having determined whether the project may have a significant effect on the environment." Section 21167, subdivision (b) establishes a 30-day limitation period for actions "alleging that a public agency has improperly determined whether a project may have a significant effect on the environment." Although it is not entirely clear from the briefs and the record which limitation period would apply to a challenge to the 2006 Equitable

■ " '[I]f the statute of limitations has run on the previous approval, any challenge to the determination to change the project is limited to the legality of the agency's decision about whether to require a subsequent or supplemental EIR, or subsequent negative declaration . . . .' [Citation.]" (*Temecula Band of Luiseno Mission Indians v. Rancho Cal. Water Dist.* (1996) 43 Cal.App.4th 425, 437 [50 Cal.Rptr.2d 769] (*Temecula*).) Similarly, in *Benton, supra,* 226 Cal.App.3d 1467, the court held that in considering a party's contention that an agency violated section 21166 in issuing a mitigated negative declaration in connection with the modification of a project, the party may challenge only the agency's environmental review with respect to the *modification,* and not the *original project*: "Initially, the Bentons contend that all impacts of the larger project—even those already approved as part of the initial CEQA review process—must again be considered. Their arguments might be persuasive if the project under review by the board had been the original winery. But the original winery was not before the board when it issued this mitigated negative declaration; it had already survived environmental review. The only item subject to board approval was modification of the original permit to allow relocation of the winery building on the enlarged site. [Citation.] Therefore, we must evaluate the board's environmental review of the modification." (*Benton, supra,* 226 Cal.App.3d at p. 1482.)

In its order denying appellants' petition, the trial court found that "the '[P]roject' as it existed in 2008, included the [2007 EDP Regulations]." Appellants raise no challenge to this aspect of the trial court's order. Further, appellants fail to present any legal argument that the principles of finality embodied in *Temecula, supra,* 43 Cal.App.4th at page 437, and *Benton, supra,* 226 Cal.App.3d at page 1482, do not apply in this case. Thus, although appellants assert that the "[P]roject has been significantly changed since *2006*" (italics added), we conclude that because the 2007 EDP Regulations "ha[ve] already survived environmental review" (*Benton, supra,* at p. 1482), appellants may challenge only whether the revision of the 2007 EDP Regulations in the 2008 EDP Regulations warranted additional environmental review pursuant to section 21166 and Guidelines section 15162.[19]

> b. *There is substantial evidence to support the District's determination that the adoption of the 2008 EDP Regulations did not constitute a substantial change to the Project requiring additional environmental review*

Appellants contend that the 2008 EDP Regulations substantially changed the Equitable Distribution Plan and therefore, the preparation of an EIR was

---

Distribution Resolution or the 2007 EDP Regulations, it is undisputed that no challenge was brought to *either* action within *either* limitation period.

[19] The bulk of appellants' substantial evidence challenge is in fact directed at the purported significant differences between the 2008 EDP Regulations and the 2007 EDP Regulations.

required prior to their being adopted. Specifically, appellants maintain that the 2008 EDP Regulations substantially increased the priority preference that industrial users of water would receive over agricultural users in times of a water shortage (i.e., a supply/demand imbalance). We conclude that there is substantial evidence, namely the substance of the 2008 EDP Regulations, themselves, to support the District's determination that the adoption of the 2008 EDP Regulations did not constitute a substantial change to the Project requiring additional environmental review.

As noted previously, the 2007 EDP Regulations provided that in the event of a supply/demand imbalance:

". . . District shall apportion the estimated supply . . . using the following criteria: [¶] . . . [¶]

"c. Industrial users—Estimated based on past use, not to exceed contracted amount."

The 2008 EDP Regulations provide that in the event of a supply/demand imbalance:

". . . District shall apportion the Available Water Supply[20] . . . using the following criteria: [¶] . . . [¶]

"b. Industrial Users—For existing contracts, estimated based on past use, not to exceed contracted amount and contract terms. For new contracts, estimated based on anticipated use, not to exceed contract amount and contract terms, taking into consideration the Integrated Water Resources Management Plan."[21]

■ Appellants contend that the 2008 EDP Regulations made two changes to the 2007 EDP Regulations that required the District to undertake additional environmental review under section 21166. Appellants' primary contention is that the 2008 EDP Regulations substantially changed the Project by placing "even *future* industrial users over existing and historical agricultural users in terms of water use." We disagree.

---

[20] Appellants do not contend that the term "Available Water Supply" as defined in the 2008 EDP Regulations differed in any material way from the term "estimated supply" used in the 2007 EDP Regulations.

[21] The term Integrated Water Resources Management Plan (IWRMP) is not defined in the 2008 EDP Regulations. We need not consider its meaning in this opinion since appellants do not contend on appeal that the reference to the IWRMP in the 2008 EDP Regulations constituted a substantial change to the Project and appellants do not discuss the IWRMP in their brief.

As noted above, the 2008 EDP Regulations revised the 2007 EDP Regulations to state that the amount of water that industrial users entering into "new contracts"[22] with the District would receive would be *"based on anticipated use*, not to exceed contract amount and contract terms," while industrial users with "existing contracts" would receive amounts of water *"based on past use*, not to exceed contracted amount and contract terms." (Italics added.) We agree with the trial court that, reasonably construed, the effect of this revision was to permit the District to *limit* water delivery to future industrial users to an amount *less than* the amount specified in their water supply contracts. As the trial court reasoned: "No provision was made [in the 2007 EDP Regulations] for limiting water to below contract amounts if there was no history of past use. The [2008 EDP Regulations] corrected this omission by providing that 'new' contracts would receive water based on estimated 'anticipated' use, or the contract amount, whichever was less."

In our view, under the 2007 EDP Regulations, an industrial user entering into a new contract with the District that did not have a sufficient history of water use for the District to determine an amount "estimated based on past use," would be entitled to its *full* contract amount in the event of a supply/demand imbalance. Only by unreasonably construing the 2007 EDP Regulations as stating that those industrial users that entered into new water supply contracts with the District would be entitled to *no* water (because their "estimated . . . past use" was zero), an argument appellants do not make, could one interpret the 2008 EDP Regulations as *increasing* the priority preference that industrial users of water would receive over agricultural users in times of a water shortage.[23] A more reasonable interpretation is that the minor change in the 2008 EDP Regulations, which allowed the apportionment

---

[22] The meaning of "new contract[]" in the 2008 EDP Regulations is not entirely clear from the text of the regulation. However, the term appears to refer to a contract entered into between the District and an entity that does not have a sufficient history of water use for the District to be able to determine its "past use." We need not determine the precise meaning of the term in order to reject appellants' argument for the reasons stated in the text.

[23] At oral argument, appellants argued that under the 2007 EDP Regulations, "new users" were "dealt with separately" and were not subject to the 2007 EDP Regulations. In support of this contention, appellants referenced the following portion of the minutes of the December 18, 2007 meeting at which the District approved the 2007 EDP Regulations: "Orlando Foote, El Centro attorney, spoke on the apportionment of water to industrial users who have no past use, but are looking for a water supply for the next 25–30 years. They are also anxious to engage in water conservation activities with the [D]istrict. Director Hanks indicated that the Water Department's proposed integrated resource plan [(IWRMP)] would address the issues of new industry coming in, to which Director Abatti agreed."

We do not consider this argument because appellants did not raise it in their briefing on appeal. However, even assuming we were to consider this argument, we would reject it. Most fundamentally, the comments by Director Hanks are not part of the 2007 EDP Regulations, the text of which governs our consideration of this issue. In any event, the most reasonable interpretation of Director Hanks's comments would suggest that industrial users who had no history of past water use might be subject to *additional* regulations pertaining to their use of

of water to *existing* users to be based on *"past* use" and the apportionment of water to *new* users to be based in part on *"anticipated* use" (italics added), is one that *limited* water delivery to future industrial users from the amounts that they would otherwise have received under the 2007 EDP Regulations. According to the 2008 EDP Regulations and the 2007 EDP Regulations their most reasonable interpretation, it is clear that the 2008 EDP Regulations did not substantially increase the priority preference that industrial users of water would receive over agricultural users in times of a water shortage.

We reject appellants' contention that *Inyo Citizens for Better Planning v. Inyo County Bd. of Supervisors* (2009) 180 Cal.App.4th 1 [102 Cal.Rptr.3d 522] (*Inyo*), supports their contention that the District was required to prepare an EIR prior to adopting the 2008 EDP Regulations. In *Inyo*, the Court of Appeal concluded that there was substantial evidence supporting a fair argument that an amendment to a county's general plan could have a significant impact on the environment. (*Id.* at p. 7.) The *Inyo* court rejected the county's argument that the amendment was "merely a clarification" of existing policies (*id.* at p. 10), and concluded that it was "not reasonable to contend" that residential development permitted by the amendment would have been permitted under the prior general plan (*ibid.*).

As a threshold matter, *Inyo* is distinguishable in that the Court of Appeal in that case was applying the de novo standard of review that applies to a court's determination of whether there was substantial evidence supporting a "fair argument" of significant environmental effects, such that the agency in question was required to prepare an EIR in the first instance. (*Citizens for Responsible Equitable Environmental Development v. City of Chula Vista* (2011) 197 Cal.App.4th 327, 331 [127 Cal.Rptr.3d 435] ["Whether a fair argument exists is a question of law that we review de novo . . . ."]; see *Inyo, supra*, 180 Cal.App.4th at pp. 7–8 [applying "fair argument" standard].) In contrast, in this case, we are applying the deferential substantial evidence standard of review that applies to review of an agency's determination as to whether *additional* environmental review is required under section 21166.[24] Further, while in *Inyo* the court concluded that the amendment likely permitted residential developments that would not have been permitted under the prior general plan (*Inyo, supra*, 180 Cal.App.4th at p. 10), in this case, for the reasons stated above, the 2008 EDP Regulations did not increase the

water, including the IWRMP. The comments at issue do not support the conclusion that industrial users who had no history of past water use would not be subject to the 2007 EDP Regulations at all, pending the enactment of different regulations that would govern the water use of such industrial users, as counsel's argument suggests, particularly in view of the fact that the very purpose of the regulations was to apportion water "among the types of water uses in the District."

[24] The *Inyo* court did not discuss the potential applicability of section 21166 to the environmental review of the plan amendment.

preference that future industrial users of water would enjoy over agricultural users in times of a water shortage. For these reasons, we reject appellants' contention that *Inyo* demonstrates that the District was required to prepare an EIR prior to adopting the 2008 EDP Regulations.

The second purported change that appellants contend mandated additional environmental review of the Project is that the 2007 EDP Regulations were a "voluntary pilot program," while the 2008 EDP Regulations constituted a "permanent reallocation of water over the long term." We reject this contention, as well.

Most fundamentally, there is nothing in the text of either the 2007 EDP Regulations or the 2008 EDP Regulations that suggests that the former were temporary and voluntary, and the latter mandatory and permanent. On the contrary, both sets of regulations expressly state, in identical phrasing, that the apportionment of water specified in the regulations is to take place "upon SDI [(supply/demand imbalance)] declaration." The 2008 EDP Regulations thus did not revise the 2007 EDP Regulations in *any* manner with respect to this issue.

The bulk of the references to the "pilot" or "voluntary" nature of the 2007 EDP Regulations in the administrative record that appellants cite in their brief is due to the fact that the apportionment regime specified in the 2007 EDP Regulations was not immediately triggered because, at the same meeting at which the District adopted the 2007 EDP Regulations, the District *rescinded* a prior declaration of a supply/demand imbalance for the 2008 water year. The December 18, 2007 minutes state: "[D]espite the rescission of the supply/demand imbalance declaration for 2008, the board hereby agrees to proceed with an equitable distribution pilot project for the 2008 water year . . . ."[25]

Other references in the administrative record to the 2007 EDP Regulations constituting a "pilot program" appear to have been based on the notion that the regulations were subject to future revision. However, there is nothing in the administrative record that suggests either that the 2007 EDP Regulations contained a sunset provision, or that they differed in any material way from the 2008 EDP Regulations with respect to their permanency. In addition,

---

[25] The record further indicates that the District declared a supply/demand imbalance on August 5, 2008, for the 2009 water year, and then adopted the 2008 EDP Regulations in November 2008.

there is nothing in the record that suggests that the 2008 EDP Regulations may not similarly be amended, and appellants make no such argument on appeal.[26] In sum, we reject appellants' contention that additional environmental review of the Project was required prior to adoption of the 2008 EDP Regulations on the ground that the 2008 EDP Regulations were mandatory and permanent, while the 2007 EDP Regulations were voluntary and temporary.

c.   *The District's approval of a water supply contract for the Ormat geothermal project did not require additional environmental review of the Equitable Distribution Plan*

Appellants contend that the District's approval of a water supply contract for a new geothermal powerplant constituted a substantial change in the circumstances under which the Equitable Distribution Plan was being undertaken, and thus, necessitated additional environmental review of the Project pursuant to Guidelines section 15162, subdivision (a)(2).[27]

i.   *Additional factual background*

(a)   *The water supply contract for the Ormat plant*

In October 2008, the District entered into a water supply contract with Orni 18, LLC (Ormat), in connection with the development of the Ormat geothermal plant. The District's resolution approving the contract states that the contract "authorizes the provision of up to [a] maximum of 6,800 acre feet [of water] per year, an amount that can be met without reducing water available to existing customers, said maximum to be reduced over the 20 year term of the contract upon terms and conditions satisfactory to the [District's] Board of Directors." The contract provides that it is subject to the Equitable Distribution Plan and requires the owners of the plant to pay the District $1.5 million to fund the IWRMP.[28]

(b)   *Industrial and agricultural use of water in the District*

From 2001 through 2008, industrial users within the District consumed approximately 20,000 acre-feet of water yearly. The amounts ranged from a

---

[26] It also appears that many of the references to the "pilot" nature of the 2007 EDP Regulations in the administrative record were related to aspects of the Equitable Distribution Plan other than those at issue in this appeal.

[27] We emphasize that appellants contend in this appeal only that the District's entering into a water supply contract for the powerplant necessitated additional CEQA review of the *Equitable Distribution Plan*. Appellants do not raise any challenge in this action to the District's issuance of a mitigated negative declaration for the water supply contract itself.

[28] See footnote 21, *ante*, for a discussion of the IWRMP.

high of approximately 24,000 acre-feet in 2004, to a low of approximately 17,500 acre-feet in 2006. In November 2008, the District estimated that approximately 2,584,900 acre-feet of water would be available for distribution in 2009 pursuant to the Equitable Distribution Plan. The District estimated that less than 1 percent of this amount (22,500 acre-feet) would be used by industrial users, and that approximately 96.7 percent (2,498,500 acre-feet) would be available for agricultural crops.

### ii. *Application*

We must determine whether there is substantial evidence to support the District's implicit determination that its approval of the water supply contract for the Ormat plant did not constitute a substantial "change[] . . . with respect to the circumstances under which the project is undertaken," that would "require major revisions of the previous . . . negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects." (Guidelines, § 15162, subd. (a)(2).) More specifically, we must determine whether appellants have demonstrated that the District erred in implicitly concluding that its approval of the water supply contract for the Ormat plant did not substantially change the circumstances under which the Project's establishment of a priority preference for industrial users of water over agricultural users in times of a water shortage would be undertaken.

The bulk of appellants' brief pertaining to the Ormat plant and geothermal power, in general, is based on the contention that the 2008 EDP Regulations increased the priority preference that industrial users of water would receive over agricultural users in times of shortage by extending that preference to future industrial users of water in the District, and thereby encouraged such users to locate in the District. For example, appellants argue in their brief: "Because the 2008 final EDP extended the priority to new industrial users, potential industrial users can now count on a guaranteed and virtually infinite supply of water from [the District] . . . . [¶] This is no idle concern. . . . [T]here is both actual and potential growth in the renewable energy field with the [the District], specifically for geothermal use."

Any contention that additional environmental review was required due to these changes fails in light of our conclusion that the 2008 EDP Regulations did not *increase* the priority preference that future industrial users of water would receive over agricultural users in times of shortage, but rather,

permitted the District to *limit* water delivery to future industrial users to an amount less than that to which they would have been entitled under the 2007 EDP Regulations. (See pt. III.B.2.b., *ante.*)

In the portion of their brief specifically addressing whether the District's approval of the Ormat contract constituted a significant circumstance under Guidelines section 15162, subdivision (a)(2), appellants contend that the District learned that the Ormat plant required more water to produce a given amount of power than was previously thought, and that the 6,800 acre-feet of water a year to be supplied to the plant was about " '30 times what farmers use for the same acreage.' " Appellants fail to explain how either of these facts demonstrates that there is insufficient evidence to support the District's implicit determination that entering into a water supply contract for the Ormat geothermal project did not constitute a substantial change in the circumstances under which the Equitable Distribution Plan's establishment of a priority preference for industrial users of water would be undertaken, and we see no basis for such a conclusion. Neither fact demonstrates that the Project's establishment of a priority preference for industrial users of water over agricultural users in a time of water shortage would have new environmental effects or a substantial increase in the severity of previously identified effects. Appellants do not contend that the District's approval of the Ormat contract demonstrated that the relative economic harm caused to industrial users by reducing water supply during a shortage would be any less than the harm to agricultural users, nor do appellants offer any other basis for concluding that the District's approval of the contract required additional review of the Project.

To the extent that appellants intend to contend that the volume of water at issue in the Ormat contract necessitated further environmental review of the 2008 EDP Regulations, we reject any such contention. The Ormat contract involves less than one-quarter of 1 percent of the water supply to be distributed pursuant to the Equitable Distributional Plan. Further, there is substantial evidence in the record indicating that the amount of water used by industrial users in the District has been essentially constant during the relevant time period.

Accordingly, we conclude that the District did not err in failing to conduct additional environmental review of the Equitable Distribution Plan in light of its approval of a water supply contract for the Ormat geothermal plant under Guidelines section 15162, subdivision (a)(2).

## IV.

## DISPOSITION

The trial court's judgment denying the petition for writ of mandate on appellants' CEQA claim is affirmed. The District is entitled to recover costs on appeal.

Huffman, Acting P. J., and McIntyre, J., concurred.